Thatcher, J.
íhe facts agreed by the in this case are too voluminous to be repeated on this occasion ; and it will be sufficient to observe, that they are chiefly the contents of the deeds of the original founders of the Academy, of the several posterior benefactors and donors to the same, the statutes of the Theological Institution, and of the associate foundation, including the religious creed of these two foundations. It is the less necessary to recite these facts in detail here, as the counsel for the defendants have reduced *480 their arguments to a few specific objections in writing, which will be particularly noticed, and in discussing which the whole subject will be explained.
The first objection is, that “ the devise is void, because a corporation is not capable of taking and holding property as a trustee.”
It being generally admitted that corporations are the mere creatures of the legislature, which can invest them with more or fewer powers and capacities, and these more or less enlarged, according to ns own good pleasure ; it has appeared to my mind a little singular, how the principle of this objection could have become a question of general discussion. What are the powers and capacities of a particular corporation may very naturally be a subject „f inquiry. In some cases the inquiry might be a question of law, and sometimes a matter of fact, to be decided respectively by the court or jury. I can only account for the general inquiry, by supposing that the oldest corporations were of prescriptive origin, and that immemorial usage did not permit them to take property in trust for third persons ; and that, instead of reasoning from the abstract nature of corporations, or the power of the Crown or of Parliament to create new ones, lawyers drew too strict a conclusion, in the nature of a maxim, from those in existence, and applied it, as a principle of [*554] construction, * to all of a more modern date, as they were beginning to exercise powers in trust.
There is nothing in the nature of corporations, as described by Kyd, (who seems to have made up his definition from a careful examination of all the various kinds of such bodies known in the English law,) that would exclude them from taking property to the use of others besides themselves. “ They are,” he says, “ a collection of many individuals, united into one body, under-a specific denomination, having perpetual succession under an artificial form, and vested, by the policy of the law, with the capacity of acting, in several respects, as an individual, particularly of taking and granting property, of contracting obligations, and of suing and being sued, of enjoying privileges and immunities in common, and of exercising a variety of political rights, more or less extensive, according'to the design of its institution, or the powers conferred upon it, either at the time of its creation, or at any subsequent period of its existence.” He again says, a corporation had been called by some a mere-capacity to sue and be sued, and to take and to grant, which, he observes, is as ridiculous as it would be, to say that a man is a mere capacity to walk with two feet. It is not a capacity, but a political person in which many capacities reside. As, then, it can take and grant property generally, and exercise a variety of political rights, more or less extensive according to the design of its institution ; who shall s-av. without some evidence from immemorial usage, or drawn *481 from the charter of its creation, that it cannot take and hold as trustees ?
The author before cited, in speaking of the distribution of corporations into their different kinds, and particularly of those called sole corporations, which he thinks ought not to be called corporations, although they had always been considered as such in the English law, says they are divided into two kinds, namely, those which have a corporate capacity for their own benefit; and those which act only as trustees for the benefit of others. Of this latter kind is the * Chamberlain of London, who may take a recogni- [ * 555 ] zance to himself and successors, in his political capacity, in trust for the orphans.(2)
It has been said, that a corporation aggregate cannot, by the strict rules of the common law, be seized of the lands to the use of another ; because this is foreign to the purpose of its institution ; as the persons who compose the corporations might, in their natural capacities, have been seized to the use of others, it would be nugatory to allow them to do that in their corporate capacity, which they had power to do in their natural; since the purpose of incorporating them was to confer powers to do something, which they could not before do.
This is begging the question ; and, at most, can only be true of those corporations at common law, where the usage proves that they were excluded from taking to the use of third persons. There is a fallacy in the reason assigned for an incorporation, that it is to enable the persons to do something in their corporate capacity, which they could not do in their natural ; and it is a sufficient reply to say, that, although certain individuals might get along with the business, as trustees of an academy, and possibly execute the will of the founder, yet, by having corporate powers given them, the intent of the founder may be more effectually carried into execution.
At the time of passing the statute of uses, it was unsettled, (says William H. Rowe, in his 113th note upon Bacon on Uses,) whether a corporation could take to any other use than its own. Brook in the 14 Hen. 8, inclined to the opinion, that a corporation might be enfeoffed to an express use.(3) But, in a subsequent case,(4) he states it as being the better opinion, that a corporation cannot be seized to an use ; for their capacity is only to take to their own use. And in a case, 28 Hen. 8, the next year after the statute of uses, it was said that an abbey and convent could take only to their own Use.(5) The same writer continues, “ It is to be observed that the *482 foregoing cases are to show that a corporation cannot take [*556] to the use of another. For as to * the case generally, whether a corporation can stand seized to an use, a material distinction is to be made between their capacity of standing seized to an use, where they are enfeoffed to an use originally, and so take to that use in the first instancé, and where they stand seized to an use by limiting an use out of, or charging an use upon, possessions already theirs. In the case of Sir Thomas Holland,(6) this distinction is taken, and upon it Chief Baron Comyns concludes, that a corporation may give an use, though they cannot be seized to an use;(7) which conclusion, says Rowe, is now generally received , although it appears that no such conclusion is warranted by that case, but, on the contrary, if it amounts to any thing, it is that a corporation may be seized to the use of another.”
We are informed by that case, that it was objected, that a bargain and sale by a corporation is not good ; for a corporation cannot be seized to another’s use, and the nature of such conveyance is to take effect by way of use in the bargainee, the statute afterwards drawing the possession to the use. But the Court rejected the exception as dangerous, such being the conveyances of the greater part of the possessions of monasteries. Now, as the objection was, that a corporation could not be seized to an use, and as that objection was rejected or overruled, the Court did, in effect, determine, that a corporation might be seized to an use. Where, then, is the authority for the modern doctrine ? In fact, it is impossible that an use could have been at common law, or since the statute, without a seizin to it; and, consequently, it is impossible for a corporation to give an use without being seized to an use.
It was further observed, in the case of Sir Thomas Holland, that, “ although a corporation could not take an estate to another’s use, yet they might charge their own possessions, with an use to another.” And there is a material difference between their taking to the use of another, contrary to their original institution, and their limiting an use to another out of their own possessions ; and more es-[*557] pecially, where * they have authority to sell and convey away those possessions. And, although all the common arguments, namely, that their capacity is only to take and use certain ; that they can only purchase for their own use, and for the ends of their creation; that they want power to take lands to the use of other people, &c., may be strong against the first part of the proposition, they do not seem to have much force against the other branch of it, namely, the limiting of an use to another out of their own possessions if not particularly restrained.
*483 It is a settled principle of law, that a community, not incorporated, cannot purchase and take in succession ; but a grant, to be valid, must be to a corporation, or some persons certain must be named, who can take by force of the grant, and who can hold either in their own right, or as trustees.(8)
The corporations mentioned in the books, of the eleemosynary kind, and those instituted under the statute of 39 Eliz. c. 5, made perpetual by statute of 21 Jac. c. 1, will warrant the assumption I have gone upon, and throw light, as authorities, on the question.
Eleemosynary corporations are such as are constituted for the perpetual distribution of the free alms or bounty of the founder of them, to such persons as he may have described. These are either hospitals for the maintenance and relief of poor and impotent persons ; or colleges for the prbmotion of learning, and the support of persons engaged in literary pursuits, of which, in England, the greater number are within the universities, and form component parts of those larger corporations. Others are out of the universities, and are no* connected with them. There are many corporations of the foregoing general nature, which are neither hospitals nor colleges ; but are classed under the head of eleemosynary corporations, because their object is by means of trustees incorporated, to carry into execution some public charity. Such are the corporation of Suííon’s Hospital, commonly called the Charter-house Corporation, and that created by Queen Anne, under the name of The Governors of the bounty of Queen Anne, for the maintenance * of the poor [ * 558] clergy. And such are many corporations of trustees for the education of poor children.(9) And Kyd, after noticing the principle of the objection I am now considering, which he denominates a strict rule of the common law, acknowledges that many corpo-ations are made trustees for charitable purposes, and are compelled to perform their trusts ; which fact he endeavours to reconcile to the strict rule by saying, “ the trust is not vested in the corporation, as a corporation ; but the natural persons of whom it is composed are created trustees, and their description, as constituent parts of a corporation, operates only as a more certain designation of their persons. This explanation,” he adds, “appears the more .reasonable, from what is said of a sole corporation ; that a man, who is a corporation sole, cannot be seized to an use in his corporate capacity, nor by his corporate name alone, without his natural name, and then the addition of his corporate name must be considered only as a fuller description of his person.” And what is all this, but showing some skill to make a wound, in order to give an opportunity of exhibiting greater skill in the healing art!
*484 Most of our academies and incorporated schools seem to me, in many respects, to resemble those eleemosynary corporations ; where those, who are the objects of the founder’s bounty, are not them selves incorporated ; but the corporate succession is vested in certain trustees, under various denominations, and having different powers and capacities, as the nature of the trust may require, and who have no title or no beneficial interest in the property committed to their charge ; but are merely employed as instruments to effectuate the end of the institution, according to the will of the founder and after benefactors.
After the foregoing authorities and observations, it is only necessaty to observe, that, whatever may have been the decisions on the principle of the objection, where it relates to corporations created for the purpose of managing their own property, as evidenced by immemorial usage, or the charters of incorporation, they are not [*559] applicable to the case at *bar ; which is that of certain persons having received property by donations and bequests, as trustees to execute the will and intent of the donors, as expressly set forth in their deeds of conveyance, and where the legislature has clothed these trustees, and such as shall succeed them by election, with certain powers, to enable them more effectually to carry the intention, will, and wishes of the founders and donors into complete execution.†
Another objection was urged upon us, — “That the legacy is void, because the trustees of Phillips Academy, by the act of June, 1807, were made capable only to hold property for the support of a theological institution, agreeably to the will of the donors, if consistent with the original design of the founders of the Academy. And the original design of the founders of the said Academy was to propagate Calvinism, as containing the important principles and distinguishing enets of our holy Christian religion, as summarily expressed in the Westminster Assembly’s Shorter Catechism ; whereas, the design of the donors of the associate foundation is, to add to Calvinism the distinguishing principles of Hopkinsianism, a union or mixture inconsistent with the original design of the original founders of the Academy and of the theological institution.”
This objection appears to me to be founded on a mistaken view of the original design of the founders of this academy ; which, as far *485 bs it can be collected from the case agreed, appears to have been to teach youth the great end and real business of living ; to convince them that goodness and knowledge must be united to form the most perfect character in human life ; that vice, in the most comprehensive sense, ought to be hated and avoided ; and virtue, in an equally extensive sense, ought to be loved and practised ; to cultivate, establish, and perpetuate in the Christian church, the true and fundamental principles of the Christian religion, as far as that institution might have influence, by an early inculcation of those principles on the minds of the pupils. * And, after detailing a num- [ *560 ] ber of particulars, as means to accomplish the end and design of the institution, it is declared that the first and principal object of the institution is, the promotion of true piety and virtue ; the second, the instruction in the English, Greek, and Latin languages, together with writing, arithmetic, music, and the art of speaking ; the third, practical geometry,, logic, and geography ; and the fourth, such other of the liberal arts, sciences, and languages, as opportunity might thereafter admit, and as the trustees should direct. The name of Calvin or Calvinism, as the end and object of the institution, is not mentioned. The objection, therefore, avails nothing against the legacy in question.
The objection seems to have confounded the benefactors to the Academy, on whose bounty the theological institution or seminary is established, with the original founders of the Academy. For, although it is true that Mr. John Phillips was one of the founders of the Academy, we must, in this instance, distinguish between him as a founder and as an after donor or benefactor. In his will he directs the donation therein given to the trustees of this Academy, to be appropriated to the support of such charity scholars as might be designed for the Gospel ministry, and, having received the first part of their education at the Academy, and before a theological professor should be instituted in this or in the Exeter Academy, as was expected in some future time, they might be assisted in their theological studies under the direction of some eminent Calvinistic minister of the Gospel, until such time as an able, pious, orthodox instructer should be sup ported in one or the other of those academies, as a Professor of Di vinity, by whom they might be taught the important principles ana distinguishing tenets of our holy Christian religion.
It deserves notice, and is evidential of the good sense and vital Christianity of this holy man, that, although this instruction was to be from some eminent Calvinistic minister, until an orthodox instructer (that is, one who should teach, explain and inculcate the important principles and distinguishing * tenets of the reli- [* 561J gion of Jksits, as it had been delivered to the saints) *486 should be instituted ; yet he is to teach nothing but our holy Christian religion. He was not to teach Calvinism.
If it be objected, that Calvinism and Christianity are identically the same, then it seems to me that the principle of the objection would be to give the preference to Calvin over Jesus as a religious instructor, and to rob the latter of some honor and glory, which I have ever considered as belonging to him over all his followers and other teachers.
The deed from Mrs. Phoebe Phillips and others to the Trustees of Phillips Academy, containing the constitution of the theological sem inary, alludes to the Westminster Assembly's Shorter Catechism; but I can find nothing of Calvinism as the object of their intended foundation, except once, where they quote a passage from the will of Mr. John Phillips. And, although the preamble to the. statute of June, 1807, enlarging the capacity of the Trustees of Phillips Academy, has the words, “ in furtherance of the designs of the pious founders and benefactors of said Academy,” it is very clear that the legislature did not intend to comprehend the after benefactors of the Academy with the original founders ; because, when the law directs how the increased revenue should be disposed of, it provides that it shall always be applied “ to said objects,” [that is, for the purpose of promoting the theological institution,] “ agreeably to the will of the donors, if” [that will or those objects be] “ consistent with the original design of the founders of the said Academy.”
It was but reasonable for the legislature, when increasing the capacity of the trustees, and enabling them to extend the objects of education, to take care that this should be done in a manner not inconsistent with the design of the original founders, who were dead. But there was not the same, or indeed any reason at all, for the legislature to interfere in what then was, or what might afterwards become, a matter of dispute between two sets of donors or benefactors ; [*562] * the bounty of neither of whom had then. been accepted by the trustees, and who were capable of adjusting and appropriating their own bounties.
I should not have thought it necessary to take any further notice of this objection, were it not that the counsel for the defendant brought forward in the argument, and urged upon the consideration of the Court with great force, several specific propositions or articles of two opposing creeds, or which, the counsel contended, were directly contrary to each other ; insisting that the intent of the founders was to maintain Calvinism, or the theology of Calvin ; and, if there were but one single article or proposition in the creed of the associate founders contrary to Calvinism, the trustees of the Academy would have no right tb take and appropriate the legacy in question ; and should the creed imposed by the associate founders omit a single arti *487 cle contained in the creed of Calvin, or as Calvinism was understood at the time of the foundation of the Academy, it would be such a departure from the intent, design, and plan of the original founders, that it must intercept the intended legacy, and prevent any right from vesting in the plaintiffs. It was then stated to be an essential article in the creed of Calvin, and what all Calvinists must necessarily believe, to make them Christians according to the Calvinistic theology, “ that the original sin of A dam is imputed to all his posterity, in some way or manner, that they are all and every one actual sinners.” Whereas, the associate foundation did not admit this article in the creed taught in their branch of the theological school, but substituted the following article in lieu thereof, and made it a necessary part of the religious creed to the professors, and to be by them taught to the students in the institution, namely : “ Adam, the federal head and representative of the human race, was placed in a state of probation, and, in consequence of his disobedience, all his descendants were constituted sinners ; ” which latter article, it was urged, is not only an article of a system of religion called Hopkinsianism, but is so inconsistent with, and contrary *to, the system of Calvinism in [*563] general, and particularly to the foregoing article of the creed of Calvin, or of a Calvinistic Christian, as taught in the Assembly’s Shorter Catechism, as could not be taught in consistency and harmony with the design, views, and intentions of the original founders of the Academy ; and thus the legacy being given to promote Hopkinsianism in opposition to Calvinism, as explained in the said catechism, is void, and ought not, or rather cannot, be recovered by the plaintiffs, who, as trustees of the Academy, cannot take any donation or bequest; contrary to the intent of the founders.
To this objection, thus drawn out and explained nearly in the words of the eloquent argument, it is enough to reply, There is a clear, intelligible meaning, consistent with the whole course of the providential government of God over the natural and moral world by general laws, so far as the subject has been investigated, which may be ap plied to the two articles attempted to be contrasted, with no greater latitude in the use of language, than is frequently applied by orthodox divines to words and phrases in the Bible, not always to be taken literally ; in which sense these propositions or articles will mean the same thing. And, in such sense, they are consistent with the revela tians contained in the Bible ; which revelations make up the funda mental principles of the religion of Jesus. Hence, there is no ne cessity of conjecturing a variety of meanings, which the words may possibly be susceptible of, in minds more habituated to dwell on the theories of certain divines, than on the religion of Jesus, as delivered by-himself and those who were authorized by God the Father to preach it. And I hesitate not to say, that, in all cases like this, we *488 ought to be satisfied, whenever we can reconcile the language of honest Christians, by yielding to them that charity of construction, which it is allowed by all that we should apply to the Holy Scriptures.
For myself, I confess that I do not clearly perceive any other sense, than that in which the two articles mean substan£*564] tially * the same thing, notwithstanding some diversity of expression, in which they can be said to be true, and consistent with the Christian religion. And knowing, as we all do, the founders, as well as the after benefactors who have set up the associate foundation, to be persons of great piety and most sincere believers in the religion of Jesus ; and that the first and principal object with all of them has been to establish, teach, and enforce the belief and practice of that religion on the students of the institution, and, through them, on the whole world of mankind ; why should we be now called upon to apply an astute, narrow, and uncharitable construction upon a few technical propositions, merely to divert the legacy of a pious woman from an object dearer to her than life itself? And let me add, in this case, the object is great and noble, beyond almost any thing in our country.
The same course of reasoning and observations would apply to the objection, as it was attempted to be applied tó a supposed contradiction between some other tenets of the two supposed opposing systems of theology. But it cannot be necessary to protract this opinion more in detail, on this general objection.
Another objection was made, “ that the legacy is void by virtue of the provincial act of 1754, c. 9, § 2,(10) as the will was made in the last sickness of the testatrix, and on the day of her death.”
This objection was also taken in the case of Bartlet & al. vs. the present defendant, and the answer to it which has now been given to it by my brother, in delivering the opinion of the Court in that cause, is abundantly satisfactory to us all.
Some other objections were made at the trial, but, as they were waived, or not much relied on in the argument, it is tjot necessary to consume more time in the consideration of them ; as, on the whole case, it is the opinion of the Court that judgment must be rendered on the verdict.

 1 Roll. 515. —4 Co. 65.— Cro. Eliz. 464.

 Bro. Abr., Tit. Feoff, al. uses, pl. 10.

 Ibid. pl. 40.

 Dyer 8 b

 2 & 3 Leon, 121, 175.

 Com. Dig., Tit. Bargain & Sale, B. 3.

 Perk. § 55. — 2 Johns. Cases, 342.

 1 Kyd, 26.

 Vide Baptist Association vs. Hart's Ex'rs., 4 Wheat. 31.— 4 Plea, p. 3-23. —3 Peters's S. C. R. 481. — M'Cartee vs. Orphan Asylum Society, 9 ( owen, 437.—Jackson vs Hammond, 2 Cain. Cas. E. 337. — Whitman vs. Lex, 17 Ser. & R. 88. — Dashiell vs. Attorney-General, 5 H. & J. 392. — 3 Binn., app. 626 —2 Johns. Ch. C. 384, 389.—• Attorney-General vs Mayor of Dublin, 1 Bingh. 347. — 4 Kent, Comm. 495. — 2 Kent, Comm. 229, 232. — Gilb. Uses, p. 5. — Coggleshal vs. Pelton, 7 Johns. Ch. 292. — M' Gir vs. Aaron, 1 Penna. R. 49. — First Parish, Sutton, vs. Cole, 3 Pick 236.— 2 Powell by Jarman, 12. — Cruise, Dig. 381. — 1 Saund. Us. & Tr. 278.

 See Gen. Statutes, vol. 2, p. 1038.