BAY BRIDGE FERRY CORPORATION *v.* COUNTY COMMISSIONERS OF QUEEN ANNE'S COUNTY.

[No. 92, October Term, 1930.]

*Decided February 12th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, OFFUTT, PARKE, and SLOAN, JJ.

*Edwin F. A. Morgan* and *Richard F. Cleveland,* with whom were *Edwin .H. Brown, Jr.,* and *Semmes, Bowen & Semmes,* on the brief, for the appellant.

*Philip B. Perlman* and *W. Mason Shehan,* with whom were *J. H. C. Legg, Harrington & Harrington,* and *Shehan & Marshall,* on the brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

The appellant, the Bay Bridge Ferry Corporation, applied to the County Commissioners of Queen Anne's County for a license to operate a public ferry across the Chesapeake Bay between a point near Sandy Point in Anne Arundel County on the western shore and a point on the eastern shore near Stevensville on Kent Island, in Queen Anne's County. With its petition, the appellant filed its bond with two good and sufficient securities, as required by section 3 of article 37 of the Code of Public General Laws of Maryland, under which the application was made. The county commissioners refused to grant the license to the appellant, and on May 23rd, 1930, it filed its petition in the Circuit Court for Queen

Anne's County asking that a writ of mandamus be issued, directed to the Commissioners of Queen Anne's County, commanding them to grant to it a license to operate a ferry across the Chesapeake Bay between the points above mentioned.

In its petition, the appellant alleged that it was a body corporate, duly incorporated and existing under the laws of the State of Maryland, with full charter powers to construct, operate, and maintain a public ferry, as evidenced by its charter, a copy of which was filed, as an exhibit, with its petition. It further alleged that, at the time of filing the petition, it held valid and subsisting options on two tracts of land, one in Anne Arundel County on the western shore and the other on Kent Island near Stevensville in Queen Anne's County on the eastern shore of the bay, for the construction of the necessary piers and terminals for a public ferry which it desired to operate across the bay between the points stated, "for the purpose of transporting, as a common carrier, passengers, vehicles, animals, freight of all kinds and mail." The petition then alleged that it had applied, as stated, to the County Commissioners of Queen Anne's County for a license to operate the ferry, and that they refused, and still refuse, to grant to it such license.

The County Commissioners of Queen Anne's County filed their answer to the petition of the appellant, in which they denied that the petitioner had applied for and had been refused by them the license to operate the ferry as alleged in the petition; and, in their answer, they in substance averred:

(1) That the writ of mandamus should not issue as prayed, because the appellant has other adequate, sufficient, and convenient remedies at law available to it in the relief sought.

(2) That section 3 of article 37 of the Code (section 3, chapter 31 of the Acts of 1782) is now obsolete and that it has no application to the kind and class of ferries for which the appellant was asking a license to operate.

(3) That said act was inconsistent with, and repugnant to, subsisting laws subsequently passed covering the subject-matter of that act, and by which it was repealed.

(4) That the "law relating to transportation by Public Service Corporations, the establishing of rates, their proper operation, and all other matters and things concerning Public Service Corporations reposes in the Public Service Commission of Maryland, full, adequate and complete authority in respect thereto, and anything in article 37 of the Code * * * to the contrary has been repealed."

(5) That the proposed ferry of the appellant between Sandy Point and its terminal on Kent Island would parallel the ferry operated by the Claiborne-Annapolis Ferry Company between Annapolis and the west shore of Kent Island, with the eastern terminals of these ferries only three miles apart. That the traffic does not justify the establishment and operation of these two ferries as located. That, at the time the Claiborne-Annapolis Ferry Company, a corporation operating a ferry between Annapolis and Claiborne, was contemplating the operation of a ferry between Annapolis and Kent Island which necessitated the expenditure of considerable money by the company in the construction of its eastern terminal, it applied to and obtained from the County Commissioners of Queen Anne's County a license to operate a ferry between the points named, and by an agreement entered into at that time, by and between the Claiborne-Annapolis Company and the County Commissioners of Queen Anne's County, the latter were not to grant without the consent of the ferry company "any other franchise, permit or authorization to any corporation or individual for the purpose of operating a ferry from Kent Island to Anne Arundel County, Maryland, so long as the Claiborne-Annapolis Ferry Company, or its assigns, rendered adequate service from said Kent Island to Anne Arundel County, Maryland." That, should the County Commissioners of Queen Anne's County now revoke the agreement so made and grant a license to the appellant company to operate a ferry between the points mentioned, it would be inequitable and unfair to the Claiborne-Annapolis Ferry Company, and contrary to the public interests.

The appellant demurred to the answer, and the demurrer was overruled by the court below. Subsequently, upon a judgment being entered on the ruling, an appeal was taken to this court.

Section 3 of article 37 of the Code (section 3, chapter 31, of the Acts of 1782), under which the applicatiton for a license was here made, is as follows:

"Whenever any person shall apply to the County Commissioners or Mayor of the City of Baltimore for a license to keep a public ferry, and shall offer two good and sufficient securities, the County Commissioners or Mayor shall grant such license, notwithstanding they or he may have, previous to such application, granted license or licenses to other persons to keep a ferry at the same place."

The above-quoted section of the act of 1782 was enacted as a supplement to the original act of 1781, chapter 22, by which the justices of the several county courts were "authorized and required, at their respective March Courts, during the continuance of this Act to grant their license to any inhabitant of their county to keep a public ferry, at any place within their county, now used as such, if the said Justices shall think that a public ferry ought there to be kept and established, and from such place to any other county, or from this to any other state." This statute required the renewal of these licenses annually at the March term of the court, although they were authorized to grant such license at any other term, to continue until the March court thereafter, and any person keeping a ferry without such license was subject to the imposition of a fine for every offense.

Section 2 of chapter 31 of the Acts of 1782 authorized any two of the justices, on application to them, to appoint such person to keep a ferry, where one theretofore had been usually kept, until the next court,, while section 3 of that act, now section 3 of article 37 of the Code, as amended, the section under which the license was asked for in this case, provided:

"That when and as often as any person shall apply to the

justices of any county court for a license to keep a public ferry, and shall offer two good and sufficient securities, the said justices may and shall grant a license to such person to keep a ferry, notwithstanding the said court may have, previous to such application, granted license or licenses to other persons to keep ferry at the same place."

Section 2 of the original act of 1781, now sections 11, 12, and 13 of article 37 of the Code, as amended, required the justices of the several courts to ascertain the price of ferriage for passengers, horses, and the several kinds of carriages at every ferry by them licensed, and the said justices were required to "direct how many and what kind of boats shall be kept, and what number of able bodied and skillful hands shall be employed in the boats at every ferry by them licensed," and every person to whom a license was issued was required to set up in the most public part of his house a copy of his license and the prices allowed him for ferriage, and every person so obtaining a license was required to enter into recognizance in the sum of fifty pounds current money with two sufficient securities, conditioned that he would faithfully and diligently keep the ferry with such boats and hands as the justices granting the license should direct, from daylight to daylight, from the 1st day of November to the 1st day of March, and from an hour before, to an hour after, daylight for the residue of the year, and that he would not charge or receive any greater price for ferriage than allowed by law. By the act of 1788, chapter 33, also supplemental to the act of 1781, and now section 15 of article 37 of the Code, every person licensed to keep a ferry across the Chesapeake Bay was required to keep a good anchor and cable, a small yawl with oars and also hatches and a substantial pair of oars and setting poles under a penalty of ten pounds.

It was further provided by section 3 of the act of 1781 (now sections 4, 5, 6, and 7 of article 37 of the Code) that, if the proprietor of any place used as a public ferry which the justices thought should be continued neglected to take out license or to rent the ferry with the houses commonly used therewith to another, to be approved by the justices, the

said justices should issue their warrant to the sheriff of their county to summon twelve reputable persons to meet on the premises and to estimate the annual value of the land, not exceeding three acres, for the use of such ferry, and to make return of the inquest, with a certificate of survey, to the court at its next session, which return was to be entered upon the records of the court, and thereafter the land with the buildings thereon, so valued by the jury, were to "become the property of the county forever," to be "annually rented out to such person as the court might" think proper to license, to keep a ferry at such place "and the proprietor of the land was to be paid the annual value or rent estimated by the jury as aforesaid." Other supplemental acts thereto were passed.

We have set out quite fully the provisions of the earlier statutes in order that the object and purpose of the legislation here involved might be more easily ascertained and better understood, and also to show the character of the ferries to which the legislation related. It may be seen that the ferries existing at the time of the enactment of those statutes were altogether different in character from the ferry which is proposed to be operated by the appellant, and it is difficult to conceive that the law then enacted, one hundred and fifty years ago, with its crude regulatory features, is applicable to a ferry of the character of the one here involved, and we think there is much force in the contention of the appellees that, if the law here invoked were held to be now in force, it would have no application to the proposed ferry of the appellant.

The requirement of a license under the statute was not for the purpose of acquiring revenue, as no charge was made therefor. It is evident that its object and purpose was (1) to subject the operation of ferries, therein mentioned, to the supervision and regulation of the justices of the county courts and afterward to the Mayor of the City of Baltimore or the county commissioners of the different counties, and (2) to secure to the public means of travel, which at that time

was much interfered with by unbridged streams and rivers found in great numbers in some sections of the state.

The law, in most part, was confined to established ferries, and it was largely enacted with the view of continuing those ferries so that the public would not be deprived of their use. This is shown by the summary action provided for by the statute, in the nature of a condemnation proceeding, whereby established ferries were continued in cases where the owners of the ferries and the property used in connection therewith failed or refused to operate them.

The features of the statute by which the justices of the county courts, and afterwards the Mayor of the City of Baltimore or the county commissioners of the counties, were vested with supervisory and regulatory powers, were, we think, repealed by chapter 180 of the Acts of 1910, and the amendments thereto, now sections 346 to 418, inclusive, of article 23 of the Code of Public General Laws of this state, constituting a full and complete body or system of laws, fully covering the subject-matter of the earlier act, and which are known as the Public Service Commission Laws, by which all public utilities within this state, including ferries, are brought under the supervision and regulation of the Public Service Commission, created by said acts of 1910. *Montel v. Consolidation Coal Co.,* 39 Md. 164; *State v. Gambrill,* 115 Md. 512, 81 A. 10; *State v. American Bonding Company of Baltimore,* 128 Md. 272, 97 A. 529; *Swann v. M. & C. C. of Baltimore,* 132 Md. 258, 103 A. 441; *Beall v. Southern Md. Agricultural Ass'n.,* 136 Md. 311, 110 A. 502; *Bartlet v. King,* 12 Mass. 545, 7 Am. Dec. 99.

In *Montel v. Consolidation Coal Co., supra,* this court, quoting from *Bartlet v. King,* 12 Mass. 545, 7 Am. Dec. 99, said: "A subsequent statute revising the whole subject-matter of a former one and evidently intended as a substitute for it, although it contains no express words to that effect, must on principles of law as well as in reason and common sense, operate to repeal the former."

It may be said, however, that the act of 1910, chapter 180, contains an express provision that all acts or parts of acts in

conflict or inconsistent with any of its provisions were thereby repealed.

The subject-matter of the early statute in this case was the supervision and regulation of the operation of the public ferries of this state. It is true the statute conferred upon the county commissioners the power to issue licenses to those operating public ferries, but, as we have said, the chief object and purpose of that provision of the statute was to bring the operation of such ferries under the supervision and regulation of those granting the licenses. By the act of 1910, the operation, not only of ferries, but of all other public utilities or public service corporations within the state, was brought under the supervision and regulation of the Public Service Commission. Therefore the supervision and regulation of public ferries was, by the act of 1910, transferred from the county commissioners to the Public Service Commission. To effect the repeal of section 3 of chapter 31 of the Acts of 1782 by the act of 1910, constituting a complete system of legislation and dealing with the same subject-matter, it was not essential that the later act should embrace every provision of the former act. *Turner v. State,* 55 Md. 260; *Montel v. Consolidation Coal Company, supra; State v. Conkling,* 19 Cal. 501. And whether a person or corporation desiring to operate a public ferry in this state is or is not required under the act of 1910 to obtain from the Public Service Commission or from any other source named in that act license or permission to operate such ferry does not affect the question of the repeal of section 3, chapter 31 of the act of 1872 (section 3 of article 37 of the Code), by the subsequent act of 1910, for, by *Turner v. State, supra,* it was held that, when "the Legislature makes a revision of particular statutes, and passes a general statute upon the subject, and it is evident from the general framework of the statute, and the manner in which the subject-matter is dealt with, that the Legislature intended such general statute to be a complete system of legislation in regard to the matter, the statute thus passed must be considered as a substitute for all prior laws on the subject; and the provisions of such prior laws as are not embraced by the latter

statute, are thereby repealed." What we have said as to the repeal of the earlier statutes does not apply to the provisions thereof relating to ferries belonging to the public except those conferring upon the Mayor of Baltimore City, or upon the county commissioners of the counties, supervisory or regulatory powers in the operation of such ferries by their lessees or persons with whom they contract to operate them. Taking the view we do of this case, we think the court was right in overruling the demurrer to the answer, for, in our opinion, the County Commissioners of Queen Anne's County were without authority, for the reasons we have stated, to grant the license asked for by the appellant.

*Judgment affirmed, with costs.*