No. 7824.

SUCCESSION OF PATRICK IRWIN.    ON OPPOSITIONS.

| | |
|---|---|
| 33 | 63 |
| 48 | 272 |
| 33 | 63. |
| 109 | 601. |

The claim of the City of New Orleans on an alleged judgment *in personam* for drainage taxes, against a person whose succession was opened in the Second District Court for the Parish of Orleans, was properly before said Court for recognition, classification and payment by the Executors.

Such a judgment is only prescriptible by ten years from its rendition.

Under the Constitution of 1868, several objects might be contemplated in a statute, but each object must have been expressed in its title.

Laws in derogation of common right must be strictly construed and not extended beyond their precise terms.

Of this character are those laws which are designed to substitute a summary mode of procedure to the ordinary rules of practice.

Act No. 30 of the Legislature of 1871 could not constitutionally, under the title of "An Act to provide for the drainage of New-Orleaans," provide for the creation of a new drainage District and still less for the institution of *extraordinary proceedings* to coerce payment of drainage taxes. The title of that Act was not indicative of such and other objects of the statute.

Judgments obtained by the summary proceedings provided for. in that law, are null and void.

When a testator, after bequeating by his will a certain claim against his debtor, exchanges with the latter the original evidence of the debt for his bond or other evidences of indebtedness, the legacy is not revoked by implication, under the Code of Louisiana.

Succession of Irwin.

The practice tolerated by this Court, in view of expediting business and lessening costs, of considering as part of the Transcript of Appeal, records of other cases filed in this Court, must be exercised with discretion and within reasonable limits. When, therefore, other Transcripts are intended, by agreement of Counsel, to be used in this way, as part of the Record of the case at bar, reference must be made to the title and number of said other Transcripts, and the attention of this Court must be called to them, or it will not treat them as part of the evidence before it; and the defect shall not be remedied on application for a rehearing.

Constitutions are to be interpreted in the same manner and according to the same rules as Statutes.

APPEAL from the Second District Court, parish of Orleans. *Tissot, J.*

*Geo. S. Lacey, Frank N. Butler,* and *S. P. Blanc,* Assistant City Attorney, for the City of New Orleans, Appellee.

*T. Gilmore & Sons, Alfred Grima* and *B. R. Forman* for Appellants, *contra.*

The opinion of the Court was delivered by

BERMUDEZ, C. J.　The account presented by the executors is opposed by the City of New Orleans, by E. C. Palmer, and by certain asylums.

The city claims to hold two *personal* judgments against Patrick Irwin.

*One* for $358 50, rendered in January, 1875, for a drainage tax on lands in the *First* Drainage District, owned by Irwin at the time; *another* for $5867 20, rendered in March, 1873, for a similar tax on real estate in the *Fourth* Drainage District, likewise the property of the deceased.

The city also claims $1500 for city taxes, and prays to be placed on the account for those sums, with interest, charges and costs, with privilege superior to *all* other creditors.

E. C. Palmer, representing himself as the holder and owner of drainage warrants for an amount exceeding $300,000, which he avers are entitled to be paid out of the drainage tax claimed by the city, joins the city in her opposition.

Four asylums oppose the same account, asking to be placed thereon as legatees of a debt due to the deceased, and by him to them and others bequeathed.

The executors have formally joined issue with the city and Palmer, pleading to the jurisdiction of the court, alleging the action to be a *real* one, and next answering that they deny generally and specially each and every allegation contained in the oppositions.

They specially charge :

That the assessment for drainage, under Acts Nos. 165 of 1858, and 191 of 1859, contemplated a benefit to be derived *before* payment of the tax, and that no such benefit has accrued ; that the several acts relied

upon by the opponents, and specially that creating the Fourth Drainage District, violate the Constitutions of the State, and of the United States, in many respects, particularly that they attempt an expropriation of property without previous indemnity to the owners; that the object, or objects of the laws, are not expressed in their titles; that the assessments violate the rule of equality and uniformity of taxation, according to value; that the city has expropriated a portion of the property on which the tax is claimed for street purposes, and has not paid for the same, judgment therefor notwithstanding; that nearly all the property on which the tax was assessed has been sold by Irwin; that Act 30 of 1871, by fixing a rate of compensation for drainage work, in excess of the value thereof, was in violation of the constitutional provisions protective of vested rights; that all the drainage work has been abandoned in the parish of Orleans; that the formalities required by law have not been fulfilled, and that the judgments are nullities.

The executors further pleaded the prescription of three, five and ten years.

The executors have not joined issue with the other opponents.

The oppositions were tried by the lower court. The exception to the jurisdiction and the pleas of prescription were overruled. The city was recognized as a creditor for $5867 20, as prayed for. The claim for city taxes was rejected. The opposition of the asylums was dismissed. The Court omitted to pass upon the claim of the city for $358 50, and on the opposition of Palmer. With those amendments the account was homologated, and the funds were ordered to be distributed accordingly.

From this judgment the executors have appealed. The city and Palmer, answering the appeal, pray that the judgment be amended, by allowing the city the sum of $358 50. The asylums join in the appeal, asking that the judgment be reversed, and that they recover, as prayed for, in their opposition.

We will proceed to pass upon the several demands, in the order in which they have been announced.

I. The exception of the executors to the opposition of the city, as judgment creditor, was properly overruled. The Second District Court, having *probate* jurisdiction, and before which the succession of Irwin had been opened, could entertain the demand of the city for payment of the judgments, which she represented herself as owning against the deceased, rendered during his lifetime. The law distinctly provides that the payment of all debts in money due by successions shall be *enforced* by the Court of Probates, and that the creditor who has obtained judgment can only be paid concurrently with the other creditors of the succession. C. P. 983, 987; 29 A. 118.

The objection that the action of the city is a *real* one, of which the Second Court could not take cognizance, is not well founded. From the *exhibits* of assessment on property in the *Fourth* Drainage District, annexed to the opposition, it appears that the same had been sold by Irwin, and, therefore, did not form part of his succession assets. So that, to the extent of the amount claimed, as the tax due on that property, the action is clearly not real, and is only for the payment of a money judgment. From the *exhibit* likewise annexed, as regards the property in the *First* Drainage District, it appears that part of it was assessed in the name of Irwin, and that the remaining portion was assessed in the name of others. There can be no objection to a creditor—claiming to have a lien, privilege or mortgage recognized by judgment—asking of the Probate Court the *enforcement* of the judgment. The executors can have no occasion to complain that they are sued before the court which has jurisdiction of the *mass* of the estate of the deceased, and which is competent to liquidate and satisfy it, by a sale of the property, and a distribution of the proceeds among the parties, creditors and legatees entitled to the same. By submitting her judgments for enforcement and payment, the city has acquiesced in the jurisdiction of the Court, and is concluded by the judgment on her claim.

II. We think that the pleas of prescription were properly overruled. The judgments were prescriptible only by *ten* years from the date of rendition. They were rendered in 1873 and 1875, and are not, even now, prescribed, the delay required not having yet elapsed.

III. The record does not contain the judgment first relied upon by the city, to claim the drainage tax on property in the First District, for $358 50. We are, therefore, unable to pass upon its merits, or regulate its effects.

IV. The second judgment averred by the city is in the transcript. It was rendered on the 20th March, 1873. It homologates the assessment rolls, and is rendered "against the several pieces of property set forth or described in such tableau or assessment roll, and the respective owners thereof, known and unknown, for the amount or amounts therein set forth against said property, or the owners thereof, together with interest," etc. T. p. 167.

It appears that the proceedings anterior and conducive to this judgment were instituted and carried on to consummation under the provisions of Act No. 30 of 1871, p. 75, into which it is claimed that the enactments of Act No. 57 of 1861, p. 43, were incorporated, so as to become a component part thereof.

It is necessary to state that in 1858 the Legislature passed Act 165, p. 114, "to provide for leveeing, draining and reclaiming swamp lands

in certain portions of the parishes of Orleans and Jefferson;" that in 1859, this act was amended, (Act 191, p. 152); that in 1861, the General Assembly adopted Act No. 57, p. 43, "to provide for the *collection* of the assessment for draining," under acts of March, 1858, and March, 1859, and that by this act, *summary* proceedings were authorized, and that in 1871, the Legislature passed an Act No. 30, p. 75, " to provide for the drainage of New Orleans."

The executors claim that this act did not authorize the proceedings in which the judgment pressed was rendered. They charge that the act is reticent about the Fourth Drainage District; that it confers no authority on the City of New Orleans, either to create that district or to levy any tax for drainage purposes on any such district; that it does not mention, in the least degree, that the collection of said tax shall be made in a *summary* manner, as is claimed was done; that even if it did, those objects are not expressed in its title; that even if they were, the effect of the act would not be to embody in it the Act of 1861, which had been repealed by Act 51 of 1869, and could not be revived in that mode; and they offer further defenses, which we deem unnecessary to mention.

It is to be noticed that Act 30, of 1871, is entitled, "*An Act to provide for the drainage of New Orleans*," and was adopted while the Constitution of 1868 was in force, which provided, (Art. 114): "Every law shall express its object *or objects* in its title." Under that provision, it was legitimate for a law to contemplate several objects, provided they were expressed in the title of the act. The Legislature in those days frequently availed itself of that privilege, previously unwarranted. Where a law, passed while that Constitution was in existence, had a title expressive of one object only, the inference which it was lawful to draw was that it was not intended to embrace more than the object so mentioned. How easy it *then* was to pass laws against which the defense of unconstitutionality, on the ground of violation of Art. 114, could prove of no avail!

While commenting upon the propriety of such constitutional rule, a writer of distinction said :

" Great abuses have been found to result from a practice of ancient date, of incorporating in the same bill subjects of a very heterogeneous nature, resorted to, either for the purpose of surprising the good faith of the law-making body, or of enlisting hostile interest in support of the proposed acts. To put a stop to this practice, many of the States of the Union have incorporated into their fundamental laws the provision necessary to guard against the same." Sedgwick, on Construction, 567 and note.

" Titles to Legislative acts have come to possess very great impor-

tance by reason of constitutional provisions which not only require that they should correctly indicate the purpose of the law, but which absolutely make the title to control and exclude everything from effect and operation, *as law,* which is incorporated in the body of the act, but is not within the purpose indicated by the title." Cooley, Const. Lim. p. 141; Also Walker vs. Caldwell, 4 A. 298.

"The framers of the Constitution meant to put an end to legislation of the vicious character referred to, which was little less than a fraud upon the public, and to require that, in every case, the proposed measure should stand upon its own merits, and that the Legislature should be fairly satisfied of its design, when required to pass upon it." 13 Mich. 494; 2 Iowa, 282; 5 N. Y. 293; 7 Md. 151; 24 Ind. 28.

"It may, therefore, be assumed as settled, that the purpose of those provisions was—*first,* to prevent hodge-podge or 'log-rolling' legislation; *second,* to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might, therefore, be overlooked and carelessly and unintentionally adopted; and *third,* to fairly apprise the people, through such publication of legislative proceedings, as is usually made, of the subjects of legislation that are being considered, in order that they may have an opportunity of being heard thereon by petition or otherwise, if they shall so desire. The general purpose is accomplished when the law has but one object which is fairly indicated in the title." Cooley, C. L. 143, 144.

"The intention is, that the title shall state its object according to the understanding of reasonable, men." 5 A. 94; 6 A. 605.

"A provision, hidden under a mass of verbiage of a statute, relating to an object entirely different, is almost inoperative, unless among the few whose business it is to read statutes." 5 A. 94, State vs. Hackett.

The instances in which acts, or portions of acts, passed in this State, in disregard of this constitutional requirement, which is mandatory, are not scarce. See 11 A. 722, 736; 5 A. 94, Duverge vs. Salter; 14 A. 7, Williams vs. Payson; 23 A. 720; 21 A. 479; 25 A. 598.

It is a principle, universally recognized, that laws in derogation of common right, are to be strictly construed, and cannot be extended beyond their clear and precise import, so as, to reach persons, cases or things, other than those they legally and specifically embrace. Of this character are those laws which are designed to substitute a mode of procedure in derogation of the ordinary rules of practice. 12 A. 769; 9 A. 233.

An Act of 1848, "to give jurisdiction to the District Courts of New Orleans over causes arising under act 3d March, 1819, respecting landlords and tenants," was held to be unconstitutional. The object of the

act was to subject tenants to *summary* proceedings. This was not expressed in the title, which gave no intimation of such provision in its contents. Duverge vs. Salter, 5 A. 94.

An Act of 1870, "to provide a revenue, to levy and collect taxes, to grant and collect licenses," etc., contained a section, 57, directing the institution of *suits* before the Third District Court for the Parish of Orleans, there to be tried by preference. The Court held that the title, being silent on the question of the extension of the jurisdiction of said Court, the section was unconstitutional. State vs. Church Wardens, 23 A. 720.

An Act of 1873, "to enforce the payment of taxes due the State, providing for the seizure and sale of the property of delinquent taxpayers, and regulating the proceedings against them and their property and tenants," was considered, as not declaring, in express terms, that a purchaser would be put in possession, *without notice* to the delinquent taxpayer, and as adopted in reference to the general laws relating to *summary* proceedings in the courts of the State, and as authorizing the District Courts to require the necessary legal notice to be issued to the party to be ousted, and to dispose of the contest in a *summary* manner. 27 A. 704.

In a suit brought by a purchaser, under a tax collector's title, made under the provisions of Act 105 of 1874, the property having been adjudicated under the Act of 1873, the proceeding for possession was by *rule.* This Court affirmed the doctrine in 27th Annual, saying that the proceeding authorized is a *judicial* proceeding, with all its incidents and characteristics, and that it must be governed by the general rules applicable to such proceedings, which, in the absence of any contrary direction, are to be commenced by petition and citation. C. P. 170, 171, Fischel vs. Mercier, 32 A. 707. This ruling was affirmed in a number of cases, not yet reported.

In Wisner vs. Mayor, 25 A. 598, it was held that, under an act of 1868, purporting to amend the first section of a statute of 1866, which was an act of incorporation, the amendments not being covered by the title, are null and void, because of a violation of act 114.

We will now proceed to apply those principles to the case before us.

It is claimed that the judgment relied upon by the City is a valid judgment, binding *personally* upon Irwin, who was living when it was rendered, and that payment of it must be enforced out of the mass of his estate, regardless of the manner in which it was, or may still be, secured to some extent, by lien on the real estate in the drainage district.

The defense is, that the judgment is, on its face, a nullity, because

not preceded by the formalities required by law to serve as a basis for the rendition of judgments.

The act, under which it is claimed that the judgment was rendered, is Act 30, of 1871, which incorporates Act 57, of 1861, providing for the collection of the assessment for draining, under acts of March, 1858 and 1859, by certain *summary* and unusual proceedings. That act of 1871 is entitled : " *An Act to provide for the drainage of New Orleans.*"

The portion of the act relied upon as authorizing the proceedings in which the judgment was rendered is Section 9, which relates mainly to the duties of the three former Boards of Drainage Commissioners, and to those of the Board of Administrators of the City of New Orleans. It directs, by PROVISO, that said board shall *make assessments* of two mills per superficial foot, in those parts of the three districts, as existing under, and created by, the act of March 18th, 1858, and of March 17th, 1859, and amendments thereto, and on such lands as are brought within the protection levees, contemplated by this act, where no assessments have been made, and *execute and enforce* the same, as provided for by the several acts of the Legislature creating and regulating said Boards of Draining Commissioners.

The proceedings, in which the judgment asserted by the city was rendered, appear to have been conducted under the provisions of the act of 1861, which, it is insisted, forms a part of it, by the general reference made therein to drainage tax collection laws. No process whatever of the court appears to have been *directed* to Patrick Irwin, and *served* on him in person or at his domicil. The only notice which is claimed was issued, and which is said to be binding on him, is the advertisement published to announce the deposit of the assessment roll in court, and to make demand of payment. This notice is addressed to " *Drainage Taxpayers.*"

If it be true, as is claimed by the city, that by Section 9, of Act 30 of 1871, the city administrators were authorized to create the Fourth Drainage District, as they have done by ordinance, to levy taxes for drainage purposes on property within its limits, to deposit plans in the mortgage office, and assessment rolls in a District Court, as was authorized to be done by the acts of 1858, 1859 and 1861, in relation to the First, Second and Third Drainage Districts, the delegation of such powers or authority was of momentous importance, and the objects in view, being of significant magnitude, should have been expressed in the title of the act, which is manifestly reticent on the subject. A reading of it suggests no other idea than that the Legislature designed to provide for *the* drainage of New Orleans. The *article* used refers the mind to a state or condition of things in existence at the time of the adoption of the act, which was : *the drainage* of New Orleans, as *it then was*

*organized;* and, also, to some additional legislation relative to it. It cannot be claimed that the title is expressive of the creation of a new drainage district, and still less of the institution of *extraordinary proceedings* to coerce payment of drainage taxes. This last conclusion is irresistible, when it is considered that the laws referred to, for the levy and enforcement of such taxes, are those creating and regulating the Boards of Drainage Commissioners, passed in 1858 and 1859, which are silent on the subject of the mode of collection, so much so, that the act of 1861 had to be enacted to provide for the unusual and *summary* proceedings which it authorizes.

If this last act was then deemed essential, and no doubt it was, to authorize exceptional and summary proceedings for the collection of the tax provided for by the acts of 1858 and 1859, as concerned the three districts thereby created, it is manifest that a similar act, or similar provisions, were likewise indispensable for the purposes; which it is said the act of 1871 contemplated. No person of reasonable understanding, on reading the title of the act, could have ever suspected that the authority claimed had been delegated; no property owner could have fairly supposed that the title covered and sanctioned against him *summary* proceedings for the collection of the drainage tax, even if one were to be levied. The title is clearly deceptive, and does not express the objects which it is insisted it does.

There being, then, no law providing for the institution of the summary and unusual proceeding, upon which rests the judgment relied upon by the city, the unavoidable consequence is, that the tax claimed cannot be recovered, and that the judgment asserted is an absolute nullity ; and, therefore, that the opposition of the City of New Orleans must be rejected.

This view of the case dispenses us from considering the numerous and plausible objections raised by the Executors to show that the judgment, in any event, could only be one *in rem,* and in no manner, *in personam,* for a purely *real* obligation to be satisfied *exclusively* out of the property burdened.

The opposition of Palmer, which hinges upon that of the city, necessarily drops with it, as the warrants could be satisfied *only* out of the tax claimed.

Constitutional amendment of 1874.

V. The opposition for city taxes was not sustained. The court considered that payment of the same had been established. The city has asked no amendment of the judgment, which, therefore, must remain unaltered.

VI. The next opposition is that of the asylums. The opponents aver that Patrick Irwin has bequeathed a debt due him from St.

John's Church, on Dryades street, in this city, the same to be divided equally between the Catholic Bishop of New Orleans for one-half, and the Catholic Orphan Asylums of New Orleans for the other half. The executors hold that this legacy was *revoked* by the testator when he received from the Diocese of New Orleans, which owed him the debt, and to whom he looked for payment, bonds of the Diocese for the amount of the debt, and when he surrendered the original evidences of the debt mentioned in the will. It appears that the bonds, amounting to ten thousand dollars, were inventoried, and are, in kind, in the hands of the executors.

The Code says, Art. 1691 : That a revocation is tacit when it results from some other disposition of the testator, or from some act which supposes a change of will. It provides further, Art. 1695, that a *donation inter vivos*, or a *sale*, made by the testator of the whole or a part of the thing bequeathed as a legacy, amounts to a revocation of the testamentary disposition for all that has been sold or given, even though the sale or donation be null, and the thing have returned into the possession of the testator, whether by the effects of that nullity or by any other means.

It is clear that, in such cases, the act of the testator, by *parting* with title to the thing, must be taken as a manifest intention to revoke the disposition made of the same thing in his will. 5 Demol. Don., § 221.

When Irwin surrendered the former evidences of his claim, and accepted in exchange the bonds of his debtor, he did not part with his claim. The original obligation remained, and underwent no material modification, save in the form of the evidence of the same. 32 A. 826; R. C. C. 2190; Pothier Obl., § 559.

It may be that in France, owing to the provisions of Art. 1038 C. N., which is not to be found in our Code, and, therefore, which was purposely left out, and which contemplates an alienation by exchange, the question might have presented some difficulty to the minds of those who might consider that the *change* of the *evidence* of a claim is an alienation of it, by exchange of itself for itself. 5 Demol., Don., 211, 212; 4 Troplong, Don., 2095.

The evidence shows that there are ten Catholic Asylums in the City of New Orleans. On the assumption that there are no more, the opponents, being four in number, would be entitled to two-fifths of the legacy, but their interest cannot now be adjusted.

It is, therefore, ordered, adjudged and decreed that, in so far as it sustains the opposition of the City of New Orleans, by placing it on the account for $5867 20, and dismisses the oppositions of the asylums, the judgment appealed from be reversed; that, in so far as it overrules the

exceptions to the jurisdiction and the pleas of prescription, and does not allow the claim of the city for $358 50, and for city taxes, and that of Palmer, it be affirmed; and proceeding to render such further judgment as should have been rendered by the said Court,

It is ordered, adjudged and decreed that the oppositions of the City of New Orleans and of E. C. Palmer be dismissed, and that the opposition of the asylums be sustained ; but that as to them the case be referred to the Civil District Court for the parish of Orleans, which has superseded the late Second District Court, and which has jurisdiction over the settlement of the succession of the deceased, for further evidence on the measure or proportion of interest of the opponents in the legacy mentioned; that when such measure or proportion shall have been ascertained, the said executors do deliver said legacy to the legatees thereof in execution of the will of the deceased.

It is further ordered, that the judgment appealed from, thus amended, be affirmed, the costs of appeal and of the lower court, on the opposition of, be paid by, the City of New Orleans, and those on the opposition of the asylums be paid by the succession.

Levy, J., absent.

## ON APPLICATION FOR REHEARING.

BERMUDEZ, C. J.  We understand the application for a rehearing as claiming that we have committed *two* manifest errors :

*First*, when we said that we did not find in the transcript of appeal before us the judgment for the drainage tax on property in the First District for $358 50.

*Second*, when we ruled that the *summary* proceedings in which the judgment for a similar tax on property in the Fourth District was obtained for $5867 20, and which it is said constitute part of the objects of Act 30 of 1871, were not expressed in the title of that statute.

1st.  We reiterate and affirm that the judgment for $358 50, said to have been rendered for the drainage tax in the First District, is not to be found in the transcript of appeal made in the succession of Patrick Irwin. But we are told in the brief for a rehearing, and *for the* FIRST *time*, that this judgment and the proceedings upon which it is predicated, are to be found in the transcript bearing No. 4338 of the docket of this Court; that the judgment and proceedings were introduced in evidence in the lower court; and that, concerning them, is to be found at p. 178 of the transcript before us the following entry:

"It is agreed, that the transcript in the Supreme Court of that case, already copied, shall serve in case of appeal."

It is to be remarked that neither the title of the case, nor the number, nor the date of filing of the transcript alluded to, is given in this

entry, and that the numerous and voluminous briefs submitted on the merits by the opponents, do not mention that entry, and no where specify the title or number of the case *in this Court*, the transcript whereof was to serve in case of appeal.

The Code of Practice, Art. 585, provides that after an appeal has been allowed, and the surety given, the clerk of the court from whose judgment the appeal is taken, shall make a transcript of all the proceedings as well as of all the documents filed in the suit, in order that the same be delivered when demanded. In furtherance of the authority delegated by law, this Court has adopted rules directing the manner in which such transcripts should be prepared for transmission.

For the purpose of lessening costs and expediting business, this Court has thought itself justified in abstaining from a too rigid enforcement of the law, and of those rules, by tolerating a moderate relaxation in permitting parties to eliminate from the transcript useless and cumbersome documents and papers, and to dispense from incorporating into it the record of cases introduced in evidence in the lower court, when there exist transcripts of the same in this Court; but such sanction has always been treated as confined within reasonable limits, and as one which, in practice, was to be used with discretion. The actual Court, for the greater relief of litigants, has itself authorized such consents, saying that it would be uselessly, nay, injuriously onerous, to require a new complete transcript of the whole voluminous record of the lower court, when large portions of the same are on file in this Court, 32 A. 563; but we have subsequently announced that parties venturing to try their cases on transcripts KNOWN to be defective, did so at their risk and peril. Bacas vs. Smith, not yet reported,

It is the jurisprudence of this Court, on this subject, that where, by agreement, the parties have the right to refer in the Supreme Court to a record already filed therein, offered in evidence *below*, and which is not embodied in the transcript, and where reference is made, *neither* to the title nor to the number of such record, this Court will not assume the inconvenience and make it their duty to hunt up among its archives for records to which allusion may have been made, nor to tax its memory with appeals previously decided. Such defects cannot be remedied on applications for a rehearing. 10 L. 514; 9 A. 292; 14 A. 67. Had counsel seasonably and properly made reference here to the transcript alluded to in the " stipulation " entered into in the lower court in *general* language, the unpleasant consequence which has followed would have been easily avoided. For such omissions and results parties litigant have none to blame but themselves.

The executors insist, in their brief filed in answer to the applica-

tion for a rehearing, upon the enforcement of those rules of practice, and thus leave us no discretion on the subject.

2d.   We have held that the title of an act, entitled "*An Act relative to the drainage of New Orleans,*" was not expressive of *summary* proceedings for the levy and collection of the drainage tax claimed, and, therefore, that *such* proceedings, in which the judgment relied upon was rendered, being unauthorized by law, were nullities, and that the judgment itself was, therefore, of no binding force and effect.

We found in the body of the act no authority for the creation by the Council of New Orleans of a new drainage district, and encountered none but the vaguest mention for the making of assessments, for the execution and enforcement of the same, on property not situated in the original three districts.

It is insisted, however, that by section 9 of that act (No. 30 of 1871), the city administrators were authorized to make assessments on such lands as were brought within the protection levees contemplated by the act, where no assessments had been made, and to execute and enforce the same, as provided for by the several acts of the Legislature creating and regulating the Board of Drainage Commissioners.

It is true that the tenor of the act is to that effect.   It is possible, nay probable, that the desire, the intention, was to engraft upon the act of 1871 the provisions of the act of 1861, which was passed for the very purpose of authorizing *summary* proceedings for the collection of drainage taxes, assessed under the acts of 1858 and 1859; but it is patent that the desire was not realized, that the intention was not expressed, and that the deficiency cannot be supplied by judicial action.   The acts to which reference is made by the 9th section, are the two last acts, which are *the* only acts " creating and regulating the Board of Drainage Commissioners."   The reference is not levelled at and does not, in terms, propose to include the act of 1861 (No. 57), which is not an act creating and regulating those boards, but which is an act to provide for the collection of drainage assessments under the acts of 1858 and 1859.   It was adopted for the express purpose of providing for *exceptional* remedies previously unknown to the law.

But, had the Act of 1871, instead of the surreptitious reference which it vaguely makes, boldly embodied, *mutatis mutandis,* the solitary and lengthy section of the act of 1861, it could not be justly claimed that such portion of it, an important and vital element or object, was *germane* to the subject matter in view, as is announced in the title.

Where the power to levy a tax is conferred, the power of collecting it, being germane, follows, but that power does not necessarily include the right to have recourse, for the purpose of collection, to *summary proceedings* of unusual harshness and rigor.   It only implies a right to

resort to *ordinary* process. The complaint is against the *summary* character of the proceedings.

The constitutional provisions, Federal and State, which guarantee due process of law to every citizen for pleading and impleading, secures to litigants the unconditional and absolute right of a legal notice and trial before judgment, however given, provided it be authorized by a *valid* statute. The forms of such notice are determined, as a rule, by the *general* laws, but, as an exception, by the *special* laws of the land.

Had the judgment insisted upon been obtained in the *regular* course of *ordinary* proceedings, no complaint from the defendants, in the process, could be entertained *on* the question of *form;* but as it was procured in the irregular course of *exceptional* proceedings, the question arose, and was determined, whether such proceedings were authorized and sanctioned by a *valid* statute.

An author of recognized distinction says :

"It is a well settled and wholesome rule, that *statutes authorizing summary* proceedings, and by which extraordinary powers are given to courts, or officers of justice, are to be strictly construed;" * * "that all statutes conferring special ministerial authority, by which any man's estate may be affected, must be strictly construed." Sedgwick, 274, 275, 300, 302.

Long since, the jurisprudence of this State has settled, that laws substituting a fictitious or constructive citation to that which is required by the *general* law, and which is the essential *sine qua non* foundation for the validity of judicial proceedings, are in derogation of common right, and must receive a rigid construction. H. D. 785 ; 7 A. 76 ; 8 A. 19 ; 9 A. 368 ; 13 A. 268 ; 14 A. 658 ; 8. A. 365 ; 9 A. 233 ; 10 A. 764, 767 ; 8 N. S. 325 ; 11· A. 338 ; 12 A. 751 ; 13 A. 455.

It is perfectly true, that the forms of a citation and of judicial proceedings fluctuate with the legislative will, and are entirely within its control and discretion. The usual form of proceedings resorted to is the *rule*, while the unusual form- is the *exception*. Exceptions to the ordinary forms have been made, and properly, too, for the prompt liquidation and enforcement of certain claims, prominent among which are those due the State, and those due municipal corporations ; but such exceptions are unequivocally provided by valid special legislation, announced in titles expressive of the same. The act of 1861 itself, under which the drainage tax for the First District is claimed to have been reduced to judgment, is an illustration of such special legislation for the collection of drainage taxes assessed on property in the drainage districts in existence at its passage ; although it has been mooted whether its title is expressive of the summary proceedings for which it provides.

Whether the formalities mentioned in the Act of 1861 were or not

complied with, is a question with which we have not dealt, for the reason that such compliance was immaterial, inasmuch as we thought that the existence of this portion, or object of the act, was not expressed, or even indicated in the title, which seems to contemplate but *one* object—"the drainage of New Orleans."

Whatever may be encountered in the body of the Act of 1871, relative to *summary* proceedings for the collection of the drainage tax sought to be recovered as against property in the Fourth Drainage District, must be considered as unwritten, and, therefore, as not justificatory of the proceedings instituted as a basis for the judgment declared upon, which is, consequently, an absolute nullity, and not susceptible of enforcement. *Non observatâ formâ, infertur adnullatio actus.* 2 Just. 388; Dwarris, 611.

While considering the meaning of the title of the Act of 1871, we took occasion to subject the language used to a slight, and, perhaps, immaterial, verbal criticism, declaring that we thought we found in it a reference to a *definite*, and not to an indefinite drainage of New Orleans, viz : that in existence at the date of its passage; deeming that, in so saying, we were, as we are, supported by the nature of the contents of the law. In doing so, we do not perceive that we have transgressed the recognized rules by which the import of human language is tested in order to be correctly measured and properly comprehended; but, even if we were mistaken—philologists will differ—the error is of no practical moment, as the emphasis or accentuation complained of does not necessarily enter in the determination of the question passed upon.

We attach no importance to the argument advanced for the *first* time in the brief, on the application for a rehearing, that the Act of 1871 became in 1874, by the constitutional amendment of that year, part of the State organic law. If that were so, and on that question we express no opinion, its incorporation at that time in the Constitution could no more have a retroactive effect than could be claimed for statutory legislation.

The general doctrine is, that constitutions are to be expounded in the same way and according to the same rules as statutes. Bishop on St. Cr. § 92 ; 7 Md. 135 ; 5 Ind. 557 ; 5 Md. 337.

The general rules of interpretation are the same, whether applied to statutes or constitutions. Sedgwick, Constr. 19.

We are aware of no reasons applicable to ordinary legislation which do not upon this point apply equally well to constitutions. Cooley on Const. Lim. 63 ; 3 Ind. 258 ; 21 N. Y. 12 ; 10 O., N. S. 588.

This principle is not only applicable to legislative acts, but to State constitutions. Wade on Retroactive Laws, § 37, § 8, and authorities in note.

If the Act of 1871 was embodied in the Constitution, in 1874, and. *then* acquired vitality, the inference necessarily is, that previous to such incorporation, it was a lifeless form, as far as it provided for *summary* proceedings for the collection of the tax in the Fourth District. It could operate prospectively only, and could not affect, so as to vivify and validate a judgment previously rendered, and which was a nullity. The Constitution of 1868, article 110, provided distinctly against the adoption of *retroactive* laws ; and it cannot be supposed that the constitutional amendment of 1874 was designed to act retrospectively in contravention of the rule thus prescribed. When so saying, we do not wish to be understood as meaning that a constitution cannot validly contain retroactive provisions which do not impair the obligations of contracts.

Last. The proposition lightly advanced, that the rights of the other opponent, Palmer, as a warrant holder, have been impaired by our judgment, can hardly be considered as a serious one. He has not verified by proof his averments of fact, and has no foundation upon which to stand. The constitutional prohibition against the passage of laws impairing the obligations of contracts is no protection for him. He has shown no contract, no interest in any contract; has shown no impairment of the obligations of any contract in which he may claim to be concerned. If warrants have been issued by a municipal corporation, or otherwise, under a State law, which is pronounced by the State judiciary as unconstitutional under the State Constitution, parties who have dealt in such securities have done so at their risk and expense, and must stand the consequences of their acts.

To declare otherwise than we have, would be to eliminate the constitutional safeguards which were so providently secured, against improper legislation, for the administration of law, justice, and equity, for the protection of the rights and prerogatives of the people against oppression by the few. We think that we have discharged our duty, and we are unwilling to change our views and our decree. Acting otherwise, would be doing an arbitrary act.

  Rehearing refused.