## JAMES MANLY *vs.* THE STATE.

Prior to the adoption of the present constitution a party convicted of a misdemeanor was entitled to a writ of error *ex debito justitiæ*, and the convention did not intend to, nor does the constitution, deprive the people of the State of the benefit of this process.

The constitution gives to the *judges* of the circuit courts "all the power, authority and jurisdiction" the court of *chancery* then possessed, and as the chancellor had the power to issue writs of error, the constitution devolves the same power upon the circuit judges for the counties.

Though the same comprehensive language is not used by the constitution in creating the *Superior Court for Baltimore city,* yet this writ having always belonged to the applicant as *matter of right*, and the framers of the constitution having no intention to impair this right in any degree, the judge of *that court* has the same power to issue it as the judges of the circuit courts.

The constitution is not to be interpreted according to the words used in particular clauses; the *whole* must be considered to ascertain the sense in which the words were used, and they must be taken in their common acceptation, in which they are presumed to have been understood by the framers and the people who adopted it.

The constitution, unlike acts of the legislature, owes its whole force and

authority to its ratification by the people, who judged of it by the meaning apparent on its face, according to the general use of the words employed, where they do not appear to have been used in a legal and technical sense.

In granting *equity jurisdiction* to the Superior Court, the constitution intended to secure to the people of Baltimore the same rights, and as fully in *all respects*, as by other clauses it gave the rest of the State in reference to the powers of equity courts.

A suggestion and affidavit by a prisoner for the removal of his case does not oust the jurisdiction of the court where the indictment is found, but the case remains pending *there* until the *order for removal* is passed, and at any time before this is done the prisoner has the right to withdraw his suggestion.

An indictment contained two counts, both relating to the *same transaction*, one charging the traverser with an *assault with intent to kill*, and the other with a *simple assault and battery*, and the jury rendered a general verdict of *guilty*. Held:

This verdict was in effect a finding as to both counts, and the higher offence of the assault with intent to kill *merged* the simple assault and dispensed with a finding of *non cul.* as to that count, and judgment for the higher offence was properly passed.

The offence of an assault with intent to kill and murder is defined and prohibited by the act of 1809, ch. 138, by which a severer punishment is prescribed than at common law.

It is a common practice to insert several counts, stating the occurrence in different terms, but as it is liable to abuse, the prisoner may, when the nature of the case will permit, require the prosecutor to elect on which count or counts he will proceed, and in some cases he may demur.

Where general verdicts are rendered in such cases, the general practice in England and in this country has been to pass judgment according to the count charging the highest grade of offence.

It is the settled law of this State, that if a general verdict of guilty be found on an indictment containing several counts, it is sufficient if one is good, though all the rest are bad.

Error to the Criminal Court of Baltimore city.

The plaintiff in error was indicted at the May term 1851 of *Baltimore city court* for an assault, *with intent to kill and murder* one George Konig, and the indictment contained also a second count for a *simple assault and battery* upon the same party, at the same time.

On the 10th of July 1851, at the same term and before the same court, the prisoner made a suggestion and affidavit for the removal of his case for trial. The record then states, that

afterwards, at the May term 1853 of the *Criminal Court of Baltimore*, to which the said indictment had been transferred under and by virtue of the new constitution, the prisoner asked leave to withdraw his suggestion and affidavit aforesaid, which the court, (STUMP, J.,) granted.

The case was then, upon the suggestion and affidavit of the prisoner, that a material witness on his part was absent, continued to the September term of said court, when it was tried and the jury rendered a general verdict, as shown by the record, that the prisoner "is guilty of the premises aforesaid, in the indictment aforesaid above specified, and laid to his charge in manner and form as by the said indictment is above charged upon him."

The prisoner then moved for a new trial, upon several grounds, which need not be stated. He also moved in arrest of judgment:—1st. Because the whole matter was *coram non judice*, there being in view of the law no indictment in this court against the said Manly. 2nd. Because the verdict is uncertain: the indictment containing one count for a penitentiary offence, and another for the common law offence of assault and battery, requiring punishments different in degree and kind, and the court, under a general verdict in such a case, can render judgment upon neither.

The court overruled both these motions, and sentenced the prisoner to confinement in the penitentiary until the 26th of October 1859. To correct this judgment, the prisoner sued out a writ of error from the *Superior Court of Baltimore city*.

The cause was argued before LE GRAND, C. J., TUCK and MASON, J.

*T. Yates Walsh* for the plaintiff in error, argued:

1st. That the writ of error in this case properly issued from the Superior Court of Baltimore city. It is impossible, at this day, precisely to trace the origin of the practice of applying to the chancellor for writs of error to the common law courts. Some lawyers falling into the mistake that the writ

in Maryland is a *prerogative writ* emanating from the *sovereign*, believed, as a matter of course, it should be authenticated by the *sovereign's* seal, which, by positive enactment, was placed in the custody of the chancery court.   A more probable origin of the practice may be found in the fact, that in the earlier days of Maryland all her *law* courts of *record* were common law tribunals, and it would have been invidious and impolitic to have allowed a process in the nature of a positive command, to be issued by one of them to another, its equal in dignity and power.   The lawyers of that period, while disdaining the idea of *prerogative*, may have seen in this state of the case the propriety of a resort to the great principle of equity, that its jurisdiction will furnish a remedy whenever law is inadequate to do so.   Indeed it may be well doubted, whether under a fair construction of the statute passed in the 12th year of queen Anne, an invocation of this principle was necessary.   It may be well suggested, that the course marked out by the 5th section of that act, did dispense with the necessity of making any application, save to the clerk of the court, by which the judgment had been pronounced.   But this inquiry is immaterial.   For a long series of years a writ of error has been considered as a proper emanation from the chancery court.   And accordingly this Court of Appeals has held, that writs of error issued by the county circuit courts, sitting in equity, to their law side, are in all respects legal. And this because they have, under the new constitution, all the rights, powers and authority possessed by the court of chancery.   I have already said that this is not a prerogative writ.   A party is entitled to it *ex debito justitiæ;* so the Court of Appeals have decided more than once.   See the case of *Anderson vs. The State*, 5 *H. & J.*, 174, and *Buchanan's case, Ibid.*, 362.   It would be a reflection upon the framers of our organic law, which I am unwilling to cast, to intimate that they secured this *writ* of *right* to the people of the counties; and at the same time disfranchised the metropolis of their State with its two hundred thousand inhabitants.   It will be observed that the argument of the State's attorney comes to

Manly *vs.* The State.

this result. He *waives* the inquiry as to the power of the Chancery Court, under its prolonged existence, by virtue of the constitution, and insists, that the Superior Court for Baltimore city cannot, at *this day*, issue such a process as is now before this court. I do not perceive the force of the suggestion, that Baltimore county court, sitting as a court of equity, did not possess coordinate powers with chancery in relation to writs of error. We are called upon to give a fair and just construction to that constitution which destroyed the tribunal, where all concede the right rested. Did the professional men, assembled in grave and deliberate council, intend, not only to break down the court, but also the law? Were they such architects of ruin? Did they not rather mean to distribute the powers exercised under a general jurisdiction, among the local courts as more adequate to further the purposes of justice? The clause in the constitution relating to the circuit courts, to be sure, declares, that the judges thereof shall have and exercise, in their respective circuits, all the power, authority and jurisdiction of the present Court of Chancery; while that providing for the Superior Court declares, that it shall have equity jurisdiction within the limits of the city, *and jurisdiction in all other civil cases* not *assigned* to *the Court of Common Pleas.* Now if the proposition, that this is a common law writ, be correct, here is a common law court with the amplest powers. It is indeed a mistake to suppose that the Criminal Court is not inferior in power and authority to the Superior Court for Baltimore city. It is a mistake to argue that the Criminal Court is a common law court at all. It has a special jurisdiction marked out by particular laws, which, in effect, are adopted by the new constitution. The Superior Court, on the contrary, is the depository of all the common law powers and authority which originally belonged to the King's Bench in England, in addition to the particular authority given by the law of its creation. By the provisions of the constitution, the chancery court was prohibited from entertaining jurisdiction over new cases. To issue a writ of error was the business of the chancery court, whether as an

act of *law* or of *equity*, is immaterial. If such business had been transacted after the 4th of July 1851, it would have been a violation of the constitutional enactment. I submit, then, that this writ of error is proper and regular, and should not be quashed.

2nd. Upon the first reason for the motion in arrest, viz., that the whole matter was *coram non judice*, I have this to suggest: The indictment against Manly was found at May term 1851, and on the 10th of July in that term, he filed his suggestion and affidavit for removal. All these proceedings took place in Baltimore city court. Under the constitution, had the *Criminal* Court jurisdiction to try cases that had originated in the time of its predecessor? and if so, was this in contemplation of law a *pending* case? The very moment the affidavit and suggestion were filed, the whole matter became *coram non judice*, except for the purpose of *removal*. If the record once got into the hands of the clerk of the court to which it was *removed*, what act of Assembly gave the power to remand it to the City court? The City court ceased to have jurisdiction the instant the suggestion was filed, and having no jurisdiction over this case, it could not be transferred to the Criminal Court; the subsequent withdrawal of the suggestion did not restore the jurisdiction.

3rd. As to the form of the verdict: The indictment contained two counts; the *first* for the penitentiary *offence* created by the statute of 1809, ch. 138, and the *second* for the common law *misdemeanor*, and it is conceded these two counts are meant as descriptions of the *same transaction*. The first charges an assault *with* malice, and the other an assault *without malice*. It is a mistake to say that an *assault with intent to kill* is simply an *assault and battery;* it is an assault and battery with *aggravating circumstances*, but these circumstances *constitute* the statutory *offence*. 3 *G. & J.*, 10, *State vs. Dent*. Now I cannot understand how an assault without *malice* can be part and parcel of an *assault with malice*. The circumstances surrounding the act must make the offence one or the other. The jury, therefore, in this case have in one breath declared the traverser guilty of the penitentiary *crime*,

Manly vs. The State.

and in the next not guilty of that but guilty of an inferior one. These general verdicts were for a series of years sustained upon the ground, that whenever there were good counts and bad counts, or inconsistent counts, upon which a general verdict was rendered, the court would apply the verdict to such counts as were proper under the law and sustained by their view of the evidence. But this doctrine was discovered, in *O'Connell's case*, 11 *Clark & Finnelly*, 155, to be an invasion of the province of the jury and repudiated. It is a *concession* that the jury is to judge of the evidence, and yet the court was to be authorised to pass judgments upon counts which the jury might have believed there was no evidence to sustain. It is believed that the case of *State vs. Sutton*, 4 *Gill*, 494, sustains the decision in *O'Connell's case*. The subsequent case of *Queen vs. Gompertz*, 58 *Eng. C. L. Rep.*, 823, is supposed to be in conflict with *O'Connell's case*, but it will be observed that is not a case of *inconsistent* findings, and the court say the evidence proved *all the counts*. In the case of *Campbell vs. The Queen*, 63 *Eng. C. L. Rep.*, 799, the several counts called for the *same sort* of punishment, and Lord Denman there expressly approves of *O'Connell's case*, and says that a verdict "bad for *uncertainty* when delivered, cannot be made good by the court choosing to apply it as they may think fit." The American authorities are also in accordance with this view of the case. In 2 *McCord*, 258, *State vs. Montague*, it was held, that a general verdict of guilty, where the indictment contained two counts charging different offences for which the law prescribed *different punishments*, was bad for *uncertainty*. This position is sustained in 1 *Water. Arch.*, 175—1, and the citations there made from *Chitty*. If the verdict contains inconsistent and contradictory findings, it is bad. 1 *Mason*, 170, *Stearns vs. Barrett*. See also 3 *Grattan*, 615, *Clere's case*. 1 *Strobhart*, 455, *State vs. Anderson*. 1 *Spencer*, 404, *Stone vs. The State*. A general verdict may be right where there is no *inconsistency* in the findings, and that is all that the cases cited on the other side establish. But here the jury say the traverser is guilty of the *penitentiary offence*, and then that he is guilty of the common law *mis-*

*demeanor*. Now for these offences different punishments are prescribed, and how is the court to determine which to inflict? It is submitted, that if the court can punish at all in such a case, they must sentence for the *lesser* offence. 2 *Strobhart*, 12, *State vs. Thompson*.

But again, looking to the grammatical construction of the language of the verdict, it is a verdict upon the *second count only* in the indictment. The terms, "Guilty of the premises *aforesaid*," point to the *last* antecedent as the premises meant, which is the *second count* in the indictment. The terms, "in the indictment aforesaid specified," are also gratified by reference to the *second count*, and the verdict therefore is precisely in meaning as if the jury had said, "Guilty upon the aforesaid second count in the aforesaid indictment contained." See 1 *Moody & Robinson*, 177, and 1 *Russell & Ryan*, 531.

*Charles J. M. Gwinn*, State's Attorney for Baltimore city, for the State, argued:

1st. That the case was properly before the Criminal Court of Baltimore city at the time of the trial. The constitution gives to it *all the jurisdiction* of the old city court, and it therefore clearly had jurisdiction if the case was pending in the City Court at the time of the adoption of the constitution. Can there be a doubt that it was so pending? There was no order passed for its removal from that court, and the suggestion and affidavit for removal were *withdrawn* by the prisoner who made them. There is no power to prevent his doing this; the provision for removal was made for the benefit of the prisoner; suppose he had filed an *imperfect* suggestion, he would clearly have the right to withdraw it and file *a new one*.

2nd. That the writ of error should be quashed. On this point the learned counsel argued, that under the charter of Maryland, sec. 4, the lord proprietor had the rights of the bishop of Durham. That he had his chancellor as early as 1692, with a right in that officer to issue writs of error. That this palatinate right to a chancellorship existed to the date of the constitution of 1776, and that the chancellor, under the constitution, had all the powers of the chancellor of the

bishopric of Durham, and that this right to issue writs of error was in him alone and his powers were entire and undivided. A writ of error, therefore, is a *prerogative* common law writ, issued by the chancellor, not by virtue of any equity jurisdiction vested in him, but as the depository of a portion of the supreme power of the State, after the manner that this officer represents the king at common law.  Now my argument is, that if the present circuit courts of the State have the power to issue writs of error, the county courts had the same power prior to the adoption of the present constitution: for the act of 1815, ch. 163, gives to the county courts all the power, authority and jurisdiction of the chancellor, in precisely the same terms that the 8th sec. of the 4th art. of the constitution gives all the power, authority and jurisdiction of the court of chancery to the circuit courts.  The two grants are in *totidem verbis*, and yet it was never imagined that the old county courts had power to issue writs of error, because it is no part of equity *jurisdiction* whatever, but was a power exercised by the chancellor because he possessed the prerogative of the State to see that the courts did not exceed their jurisdiction, and this power is *indivisible*.  But at any rate, it is clear that the Superior Court of Baltimore city has no such power, for the 11th sec. of the 4th art. of the constitution, creating this court, confers upon it *equity jurisdiction* only within the limits of the city.  No act of Assembly can give to it jurisdiction larger than that given by the *constitution*, and the act, therefore, of 1852, ch. 16, sec. 1, conferring upon it *chancery powers*, is unconstitutional and void.  5 *Md. Rep.*, 337, *State vs. Mace*.

3rd.  The general verdict in this case was well taken.  The first count is only the second count stated with the statutory aggravation.  The act of 1809, ch. 138, does not *create* a new offence in making assaults with intent to kill punishable by confinement in the penitentiary.  *Arch. Pl. & Ev.*, 194. The circumstance of aggravation is only a guide to the punishment.  The indictment for an assault with intent to kill, is but an indictment for an assault and battery.  3 *G. & J.*, 11, *State vs. Dent*.  The offence is the same, the only difference being, that if aggravating circumstances are alleged and

proved, the statute makes the punishment severer, but the offence does not cease to be an *assault* because the intent to kill is *added.* An indictment may well set out counts on which the punishment is different, and a general verdict of guilty is good, and the judgment is good if it correspond with the count affixing the greatest punishment. 1 *East's Pleas of the Crown,* 408, *Rex vs. Lord Thanet.* 1 *Starkie's Crim. Pl.,* 342. *Wharton,* 864, 865. 4 *East,* 179, *King vs. Darley.* 1 *Wood. & Minot,* 305, *United States vs. Peterson.* 3 *Do.,* 166, *United States vs. Stetson.* 5 *Wheat.,* 184, 201, *United States vs. Pirates.* 20 *Ohio,* 28, *Wilson vs. The State.* 14 *Sme. & Mar.,* 124, *Wash vs. The State.* 2 *Bailey,* 73, *State vs. Crank.* 10 *Geo. Rep.,* 60, *Bulloch vs. The State.* 11 *Metcalf,* 575, *Crowley vs. The Commonwealth.* *Ibid.,* 581, *Kite vs. The Commonwealth.* 2 *H. & J.,* 429, *Burk vs. The State.* It is well settled in this country, that if there be one good count in an indictment, the general verdict of guilty will be referred to that count which is good, although others are defective. 3 *Strobhart,* 508, *State vs. Brown.* 8 *B. Monroe,* 30, *Parker vs. The Commonwealth.* 18 *Ala. Rep.,* 547, *Shaw vs. The State.* 3 *McLean,* 410, *United States vs. Burroughs.* 7 *Iredell,* 275, *State vs. Miller.* 3 *Brevard,* 416, *Poole vs. The State.* 12 *Verm.,* 300, *State vs. Davidson.* 3 *Scammon,* 328, *Townsend vs. The People.* 2 *McMullan,* 399, *State vs. Turner.* 2 *H. & J.,* 429, *Burk vs. The State.* Any inferences to be drawn from *O'Connell's Case,* 11, *Clark & Finnelly,* 155, are rebutted by the subsequent cases of *Queen vs. Gompertz,* 58 *Eng. C. L. Rep.,* 823, and *Campbell vs. The Queen,* 63 *Do.,* 799, which are directly inconsistent with it. If when one count is bad the judgment on a general verdict is to be referred to the good counts, ought not the judgment where all the counts are good, to be referred after general verdict to that count which carries with it the gravest punishment.

The question whether the verdict relates to the first or second count can be thus settled. If it relates to the second the prisoner can be tried again on the first. If the State had

so proceeded to try him, could he not have pleaded *autre fois convict*, and would not the verdict rendered in this case have sustained this plea? It being conceded, that the two counts described the same *act*, the word *"aforesaid"* can be properly referred to every count which describes the act in its most general statement in the indictment. Nor do I see how the verdict could be stated clearer than it is. The usual form has been followed, (2 *Ev. Har.*, 209,) and the verdict and the form of the judgment stand upon the long settled practice of the State, and are both in strict conformity with exact technical law.

TUCK, J., delivered the opinion of this court.

The present indictment was found in Baltimore city court at May term 1851. The traverser filed a suggestion and affidavit for the removal of the record to an adjoining county. Afterwards, at May term 1853, of the Criminal Court of Baltimore, "the indictment," (as we are informed by the record,) "having been transferred under and by virtue of the new constitution," to that court, he obtained leave to withdraw his suggestion and affidavit, and having pleaded not guilty, was convicted and sentenced to the penitentiary.

The first question arises, on the motion on the part of the State to quash the writ of error, on the ground that the Superior Court of Baltimore city had no authority to issue it.

Prior to the adoption of the present constitution, a party convicted of a misdemeanor was, *ex debito justitiæ*, entitled to prosecute a writ of error. *Anderson vs. State*, 5 *H. & J.*, 174. We have no idea that the Convention intended to deprive the people of the State, of the benefit of this process, nor do we think that by any reasonable interpretation of the constitution, such a purpose can be deduced. The chancery court was abolished, but the system of equity jurisprudence was no otherwise disturbed, than by transferring the jurisdiction to other courts. As to the circuit courts for the counties this was done in the most ample manner. Not content with devolving upon these courts all the powers, authority and

v.7

jurisdiction which the county courts then exercised, the constitution expressly declares, that the "*judges* in their respective circuits shall have and exercise all the power, authority and jurisdiction of the present court of *chancery.*" By the act of 1815, ch. 163, the county courts had equity jurisdiction conferred upon them in the most comprehensive terms, but it seems that they were never considered as having had authority to issue writs of error. If the Convention intended to restrict the circuit courts to the exercise of powers before possessed by the county courts, the first grant of jurisdiction, by the eighth section of the fourth article, would appear to have been sufficient for the purpose, and the assignment to the judges of the same powers that belonged to the chancery court would have been unnecessary, unless their design was to charge them with functions before exercised by the chancellor, and not previously conferred on the county courts "or their judges." As the chancellor had this power, it is manifest that the constitution has devolved it upon the circuit judges for the counties.

But the argument is, that the eleventh section of the judiciary article, by which the superior court for Baltimore city was created, only confers "equity jurisdiction" within the limits of that city; and that as the right to grant this writ was no part of the chancellor's equity jurisdiction, but was vested in him as the depository of a portion of the supreme power, after the manner that this officer represented the king, at common law, it does not appertain to the judge of the Superior Court, as a portion of his equity jurisdiction. It is unnecessary to inquire into the origin and nature of this writ. It is enough for us to know that it has always been considered in this State, as belonging to the applicant as matter of right; and, believing, as we have said, that the framers of the constitution had no intention to impair it in any degree, we are clear in the opinion, that the judge of the Superior Court possessed the power equally with the judges of the circuit courts.

It is true that the same comprehensive language is not

employed as to both these courts. But constitutions are not to be interpreted according to the words used in particular clauses. The whole must be considered, with a view to ascertain the sense in which the words were employed, and its terms must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people, and they judged of it by the meaning apparent on its face, according to the general use of the words employed, where they do not appear to have been used in a legal or technical sense. *State vs. Mace*, 5 *Md. Rep.*, 348.

Applying this mode of construction, it ought not to be doubted that the constitution, in granting equity jurisdiction to the Superior Court, intended to secure to the people of Baltimore the same rights, and as fully, in all respects, as by other clauses it extended to the rest of the State, in reference to the powers of the courts clothed with equity jurisdiction. If, by these other clauses, the writ of error may be claimed elsewhere, it would be unjust to the city of Baltimore, by a strict construction of these words, to deny the same power to the only court then administering equity jurisprudence within her limits. Believing that, under the constitution, the writ was not improvidently issued, it is unnecessary to express any opinion upon the act of 1852, ch. 16.

Two questions arise under the motion in arrest of judgment. 1st. As to the jurisdiction of the Criminal Court. 2nd. As to the form of the verdict.

1st. The point, on the part of the traverser, is, that, after the suggestion and affidavit for removal of the record, the Baltimore city court ceased to have jurisdiction, and could transfer none to the Criminal Court, and that the subsequent withdrawal of the suggestion did not restore the jurisdiction. We are of opinion that the jurisdiction was not ousted by the suggestion and affidavit. It does not appear that any order

was passed, and until then, the indictment remained pending in the City Court. Indeed we cannot say but that the court would have deemed the suggestion insufficient, or for some other reason have refused to remove the record.

The case being before the Criminal Court, under the constitution, the question is, whether the accused had the right to withdraw his suggestion? We think he had this right, in either court, before the order for removal was passed. The constitution authorizes the change of venue for the benefit of the party making the application. Circumstances may arise, in the progress of the cause, to render this resort unnecessary. The objection, with the party, may be to the judge, the jury, or the sheriff. (*State vs. Dashiell*, 6 *H. & J.*, 271.) If, in consequence of a change in these, the ground for the removal no longer exists, we perceive no reason against the party's submitting the case to the court, in which the suggestion may have been made. On the contrary, convenience as well as justice, might often be promoted by this course.

2nd. As to the alleged error in rendering the verdict. Each of the counts in this indictment is sufficient, and standing alone, would have authorised a judgment against the party if found guilty. It is manifest that the two counts, though alleging offences of different degrees, relate to the same transaction. The one set out in the first count "is defined and prohibited" by the act of 1809, ch. 138, (3 *Gill & Johns.*, 8, *State vs. Dent*,) by which a severer punishment is prescribed than at common law. This was necessary in order to bring the case within that act, with which the count for assault and battery might well be joined. It is quite common to insert several counts, stating the occurrence in different terms, that the indictment may, at the trial, correspond with the proof, for the State cannot always know what the evidence will be. This mode of pleading apprises the prisoner of the accusation in more precise language, and, at the same time, aids the jury in finding their verdict. But, as it is liable to abuse, the law allows the prisoner, where the nature of the case will permit, to require the prosecutor to

elect on which count or counts he will proceed, and in some cases he may demur. The general practice in England and in this country, with very few exceptions, has been to pass judgment on general verdicts in these cases, according to the count charging the highest grade of offence. And even where some of the counts are good and others bad, the practice has been to pass judgment on those which are good. This doctrine does not appear to have been questioned, until the case of *O'Connell & al., vs. The Queen,* 11 *Clark & Finnelly,* 155. If the law had been so understood in this State, before that judgment, it could not change it, and that such was the practice we have no doubt. The elementary writers, as well as reports, show this. In *Burk vs. State,* 2 *H. & J.,* 429, Judge Buchanan said, "There is no principle better established than that if a general verdict of guilty be found on an indictment containing several counts, it is sufficient if one is good, although all the rest are bad." The judgment, on rendering which this opinion was delivered, was affirmed, and, we believe, has ever since been considered as the law of this State. 1 *Ch. Cr. Law,* 249, 640. *Starkie's Cr. Pl.,* 378, ch. 20. *Rex vs. Lord Thanet, East's Cr. Law, ch.* 8, *folio* 408. *Regina vs. Ingram,* 1 *Salk.,* 384. 1 *B. & P.,* 185. 2 *Lord Raymond,* 886. *Cowp.,* 276. *Arch. Cr. Pl.,* 175. *Wheat. Cr. Law,* 618. 1 *Spencer,* 408. 2 *Strobhart,* 17. 10 *Georgia Rep.,* 60. There are decisions the other way, but we think that the weight of authority is greatly in favor of the practice pursued in this case. This branch of criminal jurisprudence was examined and discussed in 1 *Woodbury & Minot,* 305, where many cases are collected and arranged, to which we refer without citing them here.

It may be observed in reference to O'Connell's case, that the judgment was pronounced by Lords Cottenham and Campbell, against Lords Lyndhurst and Brougham, the latter sustained in the most direct terms by all the judges, whose opinions had been required, except *Parke & Coltman.* It was not questioned, that this had always been the practice, but its correctness upon principle was denied.

The counsel for the plaintiff in error contends, that, whatever the doctrine may be as to other cases, it cannot apply to an indictment like the present, because there is a manifest incongruity between the counts, one charging an assault with and the other without malice, and that the general verdict is necessarily repugnant. We think the inconsistency would be more apparent if the jury had found *guilty* on the first, but not guilty on the second count, because, as they relate to the same transaction, that finding would affirm, in one breath, that the party had committed an assault with intent to murder, and in the next, that he had committed no assault at all. We must presume that the jury understood the issues they were to try, and the consequences of their verdict, and that if they had intended to have acquitted the party of the intent charged, they would have said so. 10 *Georgia Rep.*, 60. In this case two offences, growing out of the same transaction, are connected together. One merged the other. No evidence could have been admissible on the second count that was not applicable to the other, which meets the argument of the counsel as to the confusion that might occur at the trial. 4 *H. & J.*, 432. The case is unlike *State vs. Sutton*, 4 *Gill*, 494, where the party was convicted of the minor offence, and the court held that the verdict should have been rendered on all the issues. Where a general verdict is rendered, it is in effect or finding as to all the counts. On an indictment like the one before us, the jury must, where the party is guilty on either count, find the assault to have been committed, and if guilty of an assault with the intent charged, he is necessarily guilty on both counts. So on an indictment containing counts for robbery, and an assault with intent to rob, the crime is made by the law of a higher grade by the consummation of the illegal intent. If the accused be convicted of the actual robbery, how could the jury with any consistency say that he was not guilty of the intent to rob? It appears to us that in such cases, where all the counts relate to, and are but various statements of the same occurrence, the general verdict establishes that all the circumstances exist that are

embraced in either charge. The higher crime necessarily merges the inferior offence, and dispenses with a finding of *non cul,* as to that count.

*Judgment affirmed.*