### SLANSKY *v.* STATE
[No. 61, October Term, 1948.]

96

98

*Decided January 13, 1949.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, and HENDERSON, JJ.

*Louis Lebowitz* and *Jackson Brodsky,* with whom was *Richard L. Merrick* on the brief, for the appellant.

*Harrison L. Winter, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General,* and *A. Gwynn Bowie, State's Attorney for Prince George's County,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Jack Slansky was tried by a jury in the Circuit Court for Prince George's County on the statutory charge of bigamy. Code 1939, art. 27, sec. 19. The State showed that on August 31, 1940, the defendant married Sima Lehrman in New York City, and on April 26, 1946, he married Juliet Warmack in Hyattsville. He did not take the stand, but rested his defense on a decree of divorce granted to him by the Second Judicial District Court of the State of Nevada in and for the County of Washoe on April 20, 1946. The State challenged the validity of the decree, and the jury rendered a verdict of guilty. The trial judge, after overruling a motion for a new trial, sentenced the defendant to serve eighteen months in the Maryland House of Correction. He has appealed here from the judgment of conviction.

*First.* Appellant claims that he was denied due process of law. He contends that art. 15, sec. 5, of the Constitution of Maryland, providing that in the trial of all criminal cases the jury shall be the judges of law, as well as of fact, conflicts with the Fourteenth Amendment of the Constitution of the United States. The words "due process of law" are equivalent in meaning to the words "law of the land," and mean law in its regular course of administration through courts of justice securing to the individual the benefit of those fundamental rules of the common law by which judicial trials are governed. One aid to the decision of the question whether the denial of a certain right is a denial of due process is to inquire how the right was rated during the time when the meaning of due process was in a formative

state and before it was incorporated in American constitutional law. The crucial question is: Did those who then were formulating and insisting upon the rights of the people believe that the right was so fundamental that there could be no due process without it? *Twining v. New Jersey,* 211 U. S. 78, 29 S. Ct. 14, 23, 53 L. Ed. 97.

In England the question whether the jury should have the right to decide the law in criminal cases was for centuries the subject of controversy. But at the time of American independence the prevailing rule of the common law in England was that the court should judge the law, and the jury should apply the law to the facts. This doctrine was condemned by some of the Colonial statesmen, notably John Adams, who believed that the juries should be entitled to disregard the arbitrary and unjust rulings of the judges holding office by authority of the Crown, particularly in the trial of cases concerning freedom of speech and freedom of the press. In some of the New England Colonies it was fully understood that the judges held office not for the purpose of deciding causes, for the jury decided all questions of both law and fact, but merely to preserve order and see that the parties were treated fairly before the jury. This procedure received patriotic justification as increasingly oppressive measures were taken by the royal officials; however, the fact that many of the judges had not studied law was probably an additional explanation for the procedure.

The restrictions upon the province of the judges in this State were thus due less to the English practice than to the habits to which they themselves had become accustomed in administering the law of the Colonies. Speaking of the efforts in this country to protect the individual from oppression in the administration of punitive justice, Dean Pound has said: "The colonists had had experience of the close connection of criminal law with politics. The pioneers who had preserved the memory of this experience were not concerned solely to do away with the brutality of the old law as to felonies. Even more

their constant fear of political oppression through the criminal law led them and the generation following, which had imbibed their ideas, to exaggerate the complicated, expensive and dilatory machinery of a common-law prosecution, lest some safeguard of individual liberty be overlooked, to give excessive power to juries and to limit or even cut off the power of the trial judge to control the trial and hold the jury to its province." *Pound, The Spirit of the Common Law,* 122, 123.

In the early part of the nineteenth century the trial judges in the Federal courts and the Justices of the Supreme Court, sitting on circuit, instructed the juries that they were the judges both of the law and the fact in a criminal case and were not bound by the opinion of the court. But in 1835 Justice Story wrote the leading Circuit Court opinion in *United States v. Battiste,* Fed. Cas. No. 14,545, 2 Sumn. 240, 243, which had a far-reaching influence in diverting the current of American judicial opinion away from the doctrine that juries in criminal cases are judges of the law. He conceded that the jury in a criminal case as well as in a civil case have "the physical power" to disregard the law as laid down to them by the court, but he denied that they have "the moral right" to decide the law according to their own notions or pleasure. He held definitely that it is the duty of the court to instruct the jury as to the law, and the duty of the jury to follow the law as laid down by the court.

In 1845 the Supreme Judicial Court of Massachusetts, speaking through Chief Justice Shaw in *Commonwealth v. Porter,* 10 Metc., Mass., 263, declared that it was a mistaken notion that it was the province of the jury to determine the law in criminal cases, but rather oddly held that the trial judge in that case had erred in not allowing counsel to argue the law to the jury. In 1855, after the Massachusetts Legislature had enacted a statute providing that "in all trials for criminal offenses, it shall be the duty of the jury * * * to decide at their discretion, by a general verdict, both the fact and the law

involved in the issue," Chief Justice Shaw said that the statute was merely a declaratory act which made no substantial change in the law, and held that the trial court had erred in permitting any question of law to go to the jury for decision. *Commonwealth v. Anthes*, 5 Gray, Mass., 185, 187.

Not all of the States repudiated the jury's right to judge the law in criminal cases prior to the ratification of the Fourteenth Amendment by the States in 1868. For years afterwards a number of the States clung to the doctrine that the jury should have the right to be judges of the law. The Supreme Court of Pennsylvania asserted in 1879: "The power of the jury to judge of the law in a criminal case is one of the most valuable securities guaranteed by the Bill of Rights. Judges may still be partial and oppressive, as well from political as personal prejudice, and when a jury are satisfied of such prejudice, it is not only their right but their duty to interpose the shield of their protection to the accused." *Kane v. Commonwealth*, 89 Pa. 522, 527, 33 Am. Rep. 787. In the same year the Court qualified the rule by approving an instruction that, although the jury had the right to decide the law, their only safe course was to accept the court's interpretation of the law. *Nicholson v. Commonwealth*, 91 Pa. 390. In 1885 the Court in *Hilands v. Commonwealth*, 111 Pa. 1, 2 A. 70, 72, 56 Am. Rep. 235, stated that the jurors in a capital case "are not only the judges of the facts * * * but also of the law." In 1891 the Court approved the trial court's instruction that the statement of the law by the court was the best evidence of the law, and, viewing it as evidence only, the jury are to be guided by what the court said with reference to the law. *Commonwealth v. McManus*, 143 Pa. 64, 21 A. 1018, 22 A. 761, 14 L. R. A. 89. Finally, in *Commonwealth v. Bryson*, 276 Pa. 566, 120 A. 552, 554, the Court stated that it is the duty of the jury to take the law from the court to the same extent in a criminal case as in any other, and the trial judge can properly so instruct.

In a number of other States the rule that the jury should have exclusive right to judge the law likewise underwent modification by judicial interpretation. As late as 1875 the Supreme Court of Illinois recognized the statutory right of the jury to judge the law in *Mullinix v. People,* 76 Ill. 211; but in 1906 the Court said in *Juretich v. People,* 223 Ill. 484, 79 N. E. 181, 183: "The statute which makes the jury the judges of the law and the facts has been often severely criticized by the professional, and justly so. Instead of resorting to the Legislature to repeal it, the courts have from time to time qualified it, until finally it has been rendered absolutely nugatory. No honest and intelligent jury would, upon reflection, say that by their study and experience they were better qualified to judge of the law than the court * * *."

Thirty years ago there were at least ten States in which it was provided by the State Constitution or by statute that the jury in criminal case were judges of both law and facts. These States were Connecticut, Pennsylvania, Maryland, Georgia, Tennessee, Indiana, Illinois, Louisiana, Arizona and Oregon. Today there remain only two States, Indiana and Maryland, where the jury have the constitutional right to determine the law in criminal cases. The Constitution of Indiana, art. 1, sec. 19, provides: "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." The Supreme Court of Indiana, in its latest pronouncement on the subject in 1948, definitely declared that the right of the jury to determine the law and the facts in Indiana cannot be modified or minimized by instructions or otherwise. *Steinbarger v. State,* Ind Sup., 82 N. E. 2d 519.

Under the Maryland Constitution of 1776 there was lack of uniformity in procedure with respect to instructions to juries in criminal cases. In some parts of the State it was the practice of the judges to decline to give instructions to the jury in criminal cases under any circumstances; in other parts of the State it was the practice of the judges to give advisory instructions when

requested to do so. It was regarded as entirely a matter of discretion with the judge, there being no positive duty requiring him to pursue the one course or the other. In order to make the procedure uniform throughout the State, the members of the Convention which framed the second Constitution inserted the provision that "in the trial of all criminal cases the jury shall be the judges of law as well as fact." *2 Debates and Proceedings of Md. Reform Convention,* 1851, 766-768; Md. Consitution of 1851, art. 10, sec. 5.

In 1858 the Court of Appeals held that this provision of the Constitution was merely declaratory of the pre-existing law on the subject, and that it did not authorize the jury to judge of the constitutionality of an Act of the Legislature. *Franklin v. State,* 12 Md. 236; *Demby v. State,* 187 Md. 7, 17, 48 A. 2d 586. A similar provision was inserted in the Constitution of 1864, art. 12 sec. 4, and in the present Constitution of 1867.

The decision of the United States Supreme Court in *Sparf v. United States,* 156 U. S. 51, 15 S. Ct. 273, 288, 293, 39 L. Ed. 343, that juries in criminal cases in the courts of the United States must follow the judge's instructions on matters of law, is not applicable to proceedings in State courts. There is no implication in the decision that a provision in a State Constitution providing that juries shall be judges of the law conflicts with the Fourteenth Amendment. On the contrary, Justice Harlan plainly stated in the opinion of the Court: "Undoubtedly, in some jurisdictions, where juries in criminal cases have the right, in virtue of constitutional or statutory provisions, to decide both law and facts upon their own judgment as to what the law is and as to what the facts are, it may be the privilege of counsel to read and discuss adjudged cases before the jury."

The Bill of Rights was adopted for the protection of the individual against the Federal Government, and its provisions are not applicable to similar actions done by the States. *Barron v. Baltimore,* 7 Pet. 243, 8 L. Ed. 672; *Palko v. Connecticut,* 302 U. S. 319, 58 S. Ct. 149, 82

L. Ed. 288; *Feldman v. United States*, 322 U. S. 487,. 64 S. Ct. 1082, 88 L. Ed. 1408, 154 A. L. R. 982; *Adamson v. California*, 332 U. S. 46, 67 S. Ct. 1676, 91 L. Ed. 1903, 171 A. L. R. 1223. The due process clause of the Fourteenth Amendment requires that State action shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions. But due process recognizes that differences naturally arise between procedures in the Federal courts and those in State courts, and leaves room for much of the freedom which the Constitution reserved to the States for the exercise of the police power and for their control over procedure to be followed in criminal trials in their respective courts. *Bute v. Illinois*, 333 U. S. 640, 68 S. Ct. 763, 768. The Fourteenth Amendment is not interpreted so as to impose uniform procedures upon the individual States, whose legal systems have been derived from different sources of law and reflect different historical influences. Unquestionably the jury system has undergone many modifications in its long history, and it is still undergoing revision so as to be adapted to changing conditions. But the Fourteenth Amendment does not uproot the long established systems of criminal justice under which the States have lived both before and after the adoption of the Amendment. *Fay v. New York*, 332 U. S. 261, 67 S. Ct. 1613, 91 L. Ed. 2043; *Foster v. Illinois*, 332 U. S. 134, 67 S. Ct. 1716, 91 L. Ed. 1955. In *Jackman v. Rosenbaum Co.*, 260 U. S. 22, 43 S. Ct. 9, 10, 67 L. Ed. 107, Justice Holmes said: "The Fourteenth Amendment, itself a historical product, did not destroy history for the States and substitute mechanical compartments of law all exactly alike. If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it * * *."

It may be true that the challenged provision in the Maryland Constitution is not needed today as it was in days of the province when the juries gave some protection against British oppression. But we cannot accept

the contention of appellant that he was denied due process of law under the anachronistic procedure, which has been followed throughout the State for nearly a century and in many sections of the State for possibly two centuries. In reality the constitutional provision has been interpreted by the Court of Appeals so as to give the accused every reasonable consideration possible without unduly trespassing upon the rules of constitutional construction. Long ago the Court announced that the judge in a criminal trial has the right to instruct the jury as to the legal effect of the evidence admitted at the trial. *Wheeler v. State*, 42 Md. 563, 570. It is true that the trial judge cannot be required under existing practice to instruct the jury as to the law. On the other hand, if he should consider it proper to instruct the jury, he should be careful to couch the instruction in an advisory form, so that the jury are left free to find their verdict in accordance with their own judgment of the law as well as the facts. When such an instruction is given, it goes to the jury simply as a means of enlightenment, and not, as in civil cases, as a binding rule for their government. *Broll v. State*, 45 Md. 356; *Swann v. State*, 64 Md. 423, 1 A. 872; *Dick v. State*, 107 Md. 11, 68 A. 286, 576. But even though an advisory instruction in a criminal case is not binding on the jury, yet when no objection has been made to the instruction given by the judge as to the legal effect of the evidence admitted, the instruction becomes the law of the case. *Davis v. Patton*, 19 Md. 120, 128. Also, if such an instruction is erroneous, an appeal may be taken to the Court of Appeals. *Swann v. State*, 64 Md. 423, 425, 1 A. 872; *Beard v. State*, 71 Md. 275, 281, 17 A. 1044, 4 L. R. A. 675, 17 Am. St. Rep. 536. When an advisory instruction has been given, the judge may prevent counsel from arguing contrary to the instruction. *Bell v. State*, 57 Md. 108. Moreover, even though the judge in a criminal case cannot be required under existing practice to instruct the jury, the Court of Appeals has recommended that the trial judges in criminal cases should grant properly framed prayers,

when requested, or whenever they might consider it desirable, even if not requested. *Luery v. State,* 116 Md. 284, 294, 81 A. 681, 684, 685, Ann Cas. 1913D, 161. The trial judge may give an advisory instruction to the jury that the legal effect of evidence admitted at the trial is to bring the accused within the operation of a penal statute. *Vogel v. State,* 163 Md. 267, 162 A. 705.

In fact, in every criminal trial where the jury render a general verdict, they necessarily decide such questions of law as well as of facts as are involved in the general question of guilt. If their view leads them to an acquittal, their verdict cannot be reviewed or set aside. In such a case, therefore, they pass upon the law as well as the facts, and their finding is conclusive. On the other hand, if their view leads them to a verdict of guilty, but it is the court's opinion that their verdict is against the law, the court can remedy the error by setting aside the verdict and granting a new trial. In that case, although the jury have judged of the law, the court sets aside their conclusion as improper and unwarranted. While the jury at common law are no more the judges of the law when they acquit than when they convict, the different result in the two cases is due to the maxim of the common law which will not suffer an accused party to be twice put in jeopardy for the same offense, however erroneous may have been the acquittal. In the case at bar appellant, after he was found guilty, filed a motion for a new trial, alleging the constitutional rights which he claimed were infringed; but the trial judge overruled his motion. He was thus given an opportunity to be heard by the court upon the constitutional questions.

*Second.* Appellant contends that the judgment of the court below failed to give full faith and credit to the decree of the Nevada court, and thus violated art. 4, sec. 1, of the Federal Constitution. The law is clear that the State of Maryland has exclusive jurisdiction over its citizens concerning the marriage relation and its dissolution, and therefore has the authority to prohibit them from perpetrating a fraud upon the law of their domicil

by temporarily sojourning in another State, and there, without acquiring *bona fide domicil*, procuring a decree of divorce. *Bell v. Bell*, 181 U. S. 175, 21 S. Ct. 551, 45 L. Ed. 804; *Streitwolf v. Streitwolf*, 181 U. S. 179, 21 S. Ct. 553, 45 L. Ed. 807. A decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, and domicil is a jurisdictional fact. The State of domiciliary origin is not bound by an unfounded recital in the record of a court of another State. This is especially true in a case where a State is concerned with the vindication of its social policy.

The law is now established that where a decree of divorce of one State is pleaded as a defense in a prosecution for bigamy in another State, which finds that domicil essential to jurisdiction of the State rendering the decree did not exist, such finding cannot be set aside if proper weight was given to the decree, and the issue was fairly determined by appropriate procedure, and the finding is amply supported by the evidence, even though the record would also warrant a finding to the contrary. *Williams v. North Carolina*, 325 U. S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577, 157 A. L. R. 1366. Where, however, a wife who is a resident of this State contests a divorce suit instituted by her husband in another State and disputes that he is a *bona fide* resident of that State, but the court decides that he is a *bona fide* resident and grants him a divorce, due process of law does not demand that the wife be afforded a second opportunity to litigate the existence of jurisdictional facts, and an attempted redetermination of the question in this State is void as a denial of full faith and credit to the divorce decree. *Sherrer v. Sherrer*, 334 U. S. 343, 68 S. Ct. 1087; *Coe v. Coe*, 334 U. S. 378, 68 S. Ct. 1094, 92 L. Ed. 1055.

In Maryland, where the jury are judges of both law and fact, the Court of Appeals does not pass upon the comparative weight of conflicting evidence or upon the sufficiency of evidence to establish the crime charged. Our review of a criminal case is limited to errors of law

committed by the trial court in its rulings. Where there is no reversible error in the rulings of the trial court, the verdict cannot be reversed. *Wilson v. State,* 181 Md. 1, 26 A. 2d 770; *Bright v. State,* 183 Md. 308, 318, 38 A. 2d 96; *Jones v. State,* 188 Md. 263, 52 A. 2d 484; *Davis v. State,* 189 Md. 269, 274, 55 A. 2d 702; *Hill v. State,* 190 Md. 698, 59 A. 2d 630. However, we consider it appropriate to say that the Maryland court is not precluded from questioning the jurisdiction of the Nevada court to grant the divorce. Merely because the Nevada court found that it had power to grant a divorce decree cannot foreclose re-examination by another State. The challenged decree must satisfy the Court that the reciprocal duty of respect owed by the States to one another's adjudications has been fairly discharged, and has not been evaded under the guise of finding an absence of domicil, and therefore a lack of power in the court rendering the decree. Appellant assumed the risk that Maryland might justifiably find that he had not been domiciled in Nevada. If the divorce obtained in Nevada had no legal validity in Maryland and his Maryland wife was still alive, he subjected himself to prosecution for bigamous cohabitation under Maryland law.

The decree of divorce in this case recites that defendant was personally served with summons in Washington on March 20, 1946; that no answer, demurrer, or other defense was filed by defendant, and default was regularly entered; that the case proceeded to trial, and evidence was introduced on behalf of plaintiff; that the Court found that plaintiff had been a bona fide resident of Washoe County, Nevada, for more than six weeks next preceding the commencement of the action. Mrs. Sima Slansky testified at the trial below that, while accompanied by her attorney in the corridor of the District Court Building in Washington, her husband told her that he was going to get a divorce and he would go to Reno, Nevada, if necessary, to get one. She produced a letter written by her husband in Reno, Nevada, on March 25, 1946, urging her to sign a waiver of personal service.

The letter, stating his avowed purpose of going to Reno, said: "I'm here for a divorce and I'll get one, of course, regardless if you sign the waiver or not." Mrs. Slansky also testified that in December, 1946, appellant was living at the Hotel Hawthorne in Washington. The jury in the court below were entitled to find, as they did, that appellant did not acquire domicil in Nevada, and therefore the Nevada court lacked the power to liberate him from amenability to the laws of Maryland governing domestic relations.

As we have found nothing in the record in this case to show that appellant was denied any right guaranteed by the Constitution of the United States, the judgment of conviction will be affirmed.

*Judgment affirmed, with costs.*