## HITCHCOCK *v.* STATE

[No. 177, October Term, 1956.]

276

*Decided May 8, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*John J. O'Connor, Jr.,* for the appellant.

*Stedman Prescott, Jr., Deputy Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and

■■■■■■■■■■■■■

*James W. Murphy* and *Thomas C. Nugent, Assistant State's Attorneys,* on the brief, for the appellee.

HAMMOND J., delivered the opinion of the Court.

The appellant appeals from judgment and sentence that followed conviction by a jury in the Criminal Court of Baltimore of the unlawful practice of medicine.

The appellant is a graduate of a college of naturopathy and has devoted much of his life to its teaching and practice. It is stipulated that he did not have a license to practice medicine in the State of Maryland and that he has never been registered with the Clerk of the Circuit Court for Baltimore County, where he lives, or with the Clerk of the Circuit Court of Baltimore City, where his office has been, in the book required by law to be kept by said Clerks for the purpose of registering medical licenses. The testimony shows that on six occasions a policewoman, under a fictitious name, visited appellant's office, that on these visits he used the title of doctor and attempted to diagnose and treat her for ailments, some of which she had suggested to him and others which he said he had discovered by his activities. In making his diagnosis, he used what was said to be an electronic machine that would disclose the condition of her muscles, tissues and nerves, as well as whether her body was deficient in certain necessary vitamins and minerals. She was told that she had a nutritional anemia deficiency, as well as an enlarged spleen. She paid for the diagnosis. On two occasions she received an electric diathermy treatment for the spleen condition, for which she paid. The appellant prescribed and sold her vitamins. He took a urine specimen for the purpose of analysis. While one of the treatments was going on, a police officer entered the office and made the arrest. Appellant admitted freely that he held himself out as a natural healer and that he had practiced naturopathy in Baltimore continuously since 1938 and that he was practicing at the office where he was arrested.

It is urged upon us that the trial court committed reversible error in failing to grant a motion for a directed verdict and in refusing to permit counsel for the accused to argue to the

jury the constitutionality of the act under which he was charged. Further claims are that because of newspaper articles about the trial while it was going on, a mistrial motion should have been granted and that the Supreme Bench of Baltimore abused its discretion in denying a new trial for improper conduct of jurors.

In his claim that a verdict should have been directed for want of evidence, appellant relies on the argument that the practice of naturopathy is not the practice of medicine, that at the time the Maryland Medical Practice Act was adopted in 1888 naturopathy was unknown and, so, obviously, the act was not intended to apply to it. His crowning argument on this point, which we will discuss first, is that an English statute passed in 1542, 34 and 35 Henry 8 c. 8, pertaining to "Natural Healers", was in effect in Maryland on July 4, 1776, and has continued to be the law of Maryland. The statute relied on permitted those with knowledge of the "nature, kind, and operation of certain herbs, roots and waters, and the using and ministering of them * * * to practice, use and minister * * *" them, notwithstanding any other statute to the contrary, particularly 3 Henry 8 c. 11 (1511) requiring the licensing of "Physicians and Surgeons". We pass the obvious inconsistency in appellant's argument, the inconsistency that he says naturopathy was unknown in Maryland when the Medical Practice Act was adopted, while at the same time claiming it has been recognized continuously by statute since Colonial Days. Article 5 of the Declaration of Rights of the Maryland Constitution provides that the inhabitants of the State are entitled to the "benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity * * *." There is nothing to show or to indicate that the natural healers act ever became the law of Maryland, or that by experience it was found applicable locally or that it was introduced, used or practiced by the courts of law or equity. Chancellor Kilty in 1810 in his *"Report of All English Statutes"* in force in Maryland

lists both the natural healers act and the act as to physicians and surgeons as among those that had never been found applicable in Maryland—the first at page 76, and the second at page 70. If it be assumed for the argument that the natural healers act ever was in force, it is clear to us that it was repealed by the passage of the Medical Practice Act (Acts of 1888, Chap. 429). The Medical Practice Act belongs to the class of legislation that embraces a complete scheme of regulation for a given subject. In such case, the courts have taken the view that the new law is a substitute for existing laws on the subject, and repeals those earlier laws. Where the Legislature undertakes to deal with the whole subject matter, there is an exception to the general rule that repeal by implication is not favored, although it has been said in such cases the repeal is not really by implication, but is actual, although not expressed. *Montel v. Consolidation Coal Co.,* 39 Md. 164, 171; *State v. Gambrill,* 115 Md. 506; *State v. American Bonding Co.,* 128 Md. 268, 272; *Ferry Corp. v. Queen Anne's County,* 160 Md. 398, 405; *State v. Coblentz,* 167 Md. 523, 527; *LaFontaine v. Wilson,* 185 Md. 673, 681.

The other arguments of appellant as to his right to a directed verdict were answered fully by the opinion of this Court in *Aitchison v. State,* 204 Md. 538, *certiorari* denied, 348 U. S. 880, 99 L. Ed. 692, where a conviction for practicing naturopathy was upheld. An attack on Federal grounds on the Maryland Medical Practice Act by the appellant here was rejected by Judges Soper, Chesnut and Thomsen in *Hitchcock v. Collenberg,* 140 F. Supp. 894. Judge Thomsen's opinion gives a detailed history of appellant's background and activities, as well as of the pertinent litigation as to naturopathy and its relation to the practice of medicine, both in Maryland and elsewhere. The *Aitchison* opinion pointed out that Code, 1951, Art. 43, Sec. 138, defines a practitioner of medicine as any person "* * * who shall append to his or her name the words or letters 'Dr.,' 'Doctor,' 'M.D.,' or any other title * * * with the intent thereby to imply that he or she is engaged in the art or science of healing, or in the practice of medicine * * * or who shall operate on, profess to heal, prescribe for, or otherwise treat any physical or mental

ailment or supposed mental ailment of another * * *." The Court concluded that the Legislature intended that the "practice of medicine" was to include "any practice of the art of healing disease and preserving the health other than those special branches of the art that were expressly excepted." It was noted that the Legislature prescribed special regulations for the practice of osteopathy, chiropody, and chiropractic, but that it has made no such provision for the licensing of naturopaths, despite the fact that bills frequently have been introduced in the Legislature to permit and regulate the practice of naturopathy. It was said: "The very fact that no such legislation has been passed indicates that the Legislature has not intended thus far to permit naturopaths to practice without a license. The Legislature has been careful to prevent medical treatments without the protection afforded by some official regulatory board." The conclusion of the Court was that in view of the breadth of the language employed by the Legislature to define the practice of medicine and its failure to exempt naturopaths from the definition, "we are compelled to hold that the Medical Practice Act prohibits a person desiring to engage in the healing art by the practice of naturopathy from doing so without a license from the State Board of Medical Examiners."

Since there was evidence that the appellant used the word "Doctor" in such a way as to imply that he was engaged in the art or science of healing, as well as evidence that he diagnosed supposed ailments of the policewoman and treated her for those ailments and prescribed for her, it is clear that the case properly went to the jury. The appellant would seem to have removed any doubt on the question, for, when asked "Do you treat physical ailments of your patients", he replied: "Yes sir, I do."

Appellant's claim that his counsel should have been allowed to argue to the jury that the Medical Practice Act was unconstitutional because Art. XV, Sec. 5, of the Maryland Constitution provides that "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact * * *", is without validity. The quoted words first appeared in the Constitution of 1851, and their meaning was passed upon in

1858 in *Franklin v. State,* 12 Md. 236, 243, adversely to appellant's contention. Judge Bartol wrote the opinion of the Court in the *Franklin* case and Chief Judge LeGrand filed a separate opinion. Both opinions agreed that it was apparent from the debates of the Constitutional Convention that the section in question was adopted because the judges throughout the State had differed in their views as to the extent of the rights of the jury in criminal cases. Seemingly, most of the judges had felt the jury to be the judges of the law in such cases, while some had felt, and held, that the Court must deal with the law, leaving the facts only to the jury. It had been argued to the Court that the indictment was defective, and further, that if it were not, there had been error below in not allowing counsel to argue to the jury that the statute under which the appellant was tried was unconstitutional. It was held that the indictment was deficient but Chief Judge LeGrand, noting that the point was not directly presented for decision, declared that it was proper that the true meaning of the new provision in the Constitution of 1851 should be expressed. He went on to show that in the debates of the Constitutional Convention no delegate who favored the adoption of the provision that made it clear that the jury were the judges of the law, made any "* * * pretense that it authorized a judgment by a jury of the constitutionality of an Act of Congress or of the State Legislature." Judge Bartol, in the opinion of the Court, said this: "We concur also in the views expressed by the Chief Justice, upon the question of the power of the jury in criminal cases, to pass upon the constitutionality of the law, and think that the attempt of the counsel of the traverser to argue that question before the jury, was properly arrested by the Circuit Court."

The view that the jury was the judge of the law as well as the facts in criminal cases was widely held in the early days of this country and in most States, and in the Federal Courts, the practice was that the jury should pass upon the law. For a history and discussion of the practice, and constitutional and statutory provisions on the subject, see *Slansky v. State,* 192 Md. 94, 105; the opinions in *Sparf v. United States,* 156 U. S. 51, 110, 39 L. Ed. 343, 364, particularly the

dissenting opinion by Mr. Justice Gray; and *"Juries as Judges of Criminal Law"*, 52 Harv. L. R. 582. It is undoubtedly true that in some instances the authority of the jury to pass on the law was either held or assumed to include the authority to pass on the constitutionality of the act involved. Sometimes this assumption or holding seems to have flowed from the fact that the jury undoubtedly had the power, as distinguished from the legal right, to do this and if they did so, or might have done so, and the result was an acquittal that result was final and nothing could be done about it. On the other hand, there were a number of decisions that the power of the jury to pass on the law did not include a right to decide constitutional questions. It is noted in the majority opinion of *Sparf v. United States,* 156 U. S. 51, 69, 39 L. Ed. 343, 350, *supra,* that Mr. Justice Samuel Chase, in the Circuit Court of the United States for the District of Virginia, in the trial of James Thompson Callender for seditious libel, was appalled at the suggestion by counsel that the jury was entitled, of right, to determine the constitutional validity of the Act of Congress under which the accused was indicted. Mr. Justice Chase there said: "I have uniformly delivered the opinion 'that the petit jury have a right to decide the law as well as the fact in criminal cases;' but it never entered into my mind that they, therefore, had a right to determine the constitutionality of any statute of the United States."

Other Federal cases in which the right of the jury to pass upon the constitutionality of a statute was denied on the ground that the question of the existence or validity of the statute was for the court alone, include *Lyon's Case,* Whart. St. Tr. 333, 336 (Paterson, J.); *United States v. Shive,* 1 Baldw. 510 (Baldwin, J.). The Supreme Court of Connecticut, in *State v. McKee,* 46 A. 409, 414, held that although under the Connecticut law the jury was the judge of the law as well as the facts in criminal cases, it was error for the trial judge to tell the jury that they were judges of the constitutionality of the statute, and that the jury was bound to accept the judge's opinion on that point. Reliance was put on the case of *State v. Main* (Conn.), 37 A. 80. Thus, this

Court was not alone when it declared in the *Franklin* case that constitutionality was for the court.

The appellant attacks the *Franklin* case on the ground that the language in the opinions, restricting the jury's rights, was dicta. It is true that the determination of the question was not necessarily required by the record but, nevertheless, the judicial mind deliberately and directly met the issue presented by the words of the Constitution which had been argued to it, and which would arise upon a retrial, and decided the point. The *Franklin* case has been looked upon as holding flatly that the jury in a criminal case may not pass on the constitutionality of the law. Maryland cases repeatedly so state. See *Esterline v. State,* 105 Md. 629, 636; *Miller v. State,* 174 Md. 362, 367; *Vogel v. State,* 163 Md. 267, 275. In *Slansky v. State,* 192 Md. 94, 105, 107, *supra,* Judge Delaplaine said for the Court: "In 1858 the Court of Appeals held that this provision of the Constitution was merely declaratory of the pre-existing law on the subject, and that it did not authorize the jury to judge of the constitutionality of an Act of the Legislature. *Franklin v. State,* 12 Md. 236 * * *." Judge Delaplaine said further in the *Slansky* case: "In reality the constitutional provision has been interpreted by the Court of Appeals so as to give the accused every reasonable consideration possible without unduly trespassing upon the rules of constitutional construction." Judge Dennis, in *"Maryland's Antique Constitutional Thorn",* 92 U. of Pa. L. R. 34, says: "It has been decided that juries have no jurisdiction to hear or act upon demurrers, to pass upon the constitutionality of statutes, to pass upon pre-trial motions or pleadings, * * *." Judge Markell, in his paper delivered before the Maryland State Bar Association, *"Trial by Jury—a Two-Horse Team or One-Horse Teams",* 42 Transactions, Maryland State Bar Association (1937), at least assumes the same conclusion as to lack of power of the juries to pass on constitutional questions.

If we had doubt that the matter were not settled, it would be removed by a chronological consideration of the constitutional clause, now a part of Sec. 5 of Art. XV of the present Constitution adopted in 1867. The very words that now

appear, first appeared in the Constitution of 1851, and were proposed to the people and ratified by them as part of the Constitutions of 1864 and of 1867. On familiar principles, we think, that when the constitutional convention proposed and the people adopted what is now Art. XV, Sec. 5 of the Constitution of 1867, they must be deemed to have accepted and used the words as meaning what the Court of Appeals said in 1858 they meant. Where a constitutional provision has received a judicial construction and then is incorporated into a new or revised constitution, it will be presumed to have been re-adopted with the knowledge of the previous construction and to have been intended to have the meaning given it by that construction. Cases so holding are collected in the notes in 16 *C. J. S., Constitutional Law,* Sec. 35. See 1 *Cooley's Constitutional Limitations,* 8th Ed., pp. 135-136, and also pp. 118-119; 2 *Sutherland, Statutory Construction,* 3rd Ed., Sec. 5210. In *Bandel v. Isaac,* 13 Md. 202, 223, it was said: "Now if the people of Maryland had been accustomed, and their courts had regarded the statutes on the subject of usury as importing a certain thing, whenever the same or equivalent words are employed in a subsequent Constitution or statute, the presumption of law is, that they are used in the same sense." See too *State v. Mace,* 5 Md. 337, 350, and *Manly v. State,* 7 Md. 135, 147. The provisions of Art. XV, Sec. 5, of the Constitution must be read as meaning what the Court of Appeals said they meant in the *Franklin* case, so that whatever may be the other rights of the jury to pass on the law, it has no right to pass on constitutionality. This being so, the trial court was right in forbidding counsel from arguing constitutionality to the jury. *Nolan v. State,* 157 Md. 332; *Kelly v. State,* 151 Md. 87, 98; *Franklin v. State, supra.*

Appellant's motion for a mistrial was based on an article published in the newspaper on the afternoon of the first day of the trial, which stated erroneously that he was charged with using the initials "M. D." to imply that he was a medical doctor. The actual charge was that he so used the initials "N. D.". We think that no prejudice was shown or can be inferred. The trial judge went to great lengths in his instructions to the jury to be sure that there was no prejudice

in fact. He instructed the jury that there was no evidence whatever before them that the accused ever used the initials "M. D.". He then referred to the fact that some of the jury might have seen the article in the evening paper, that the initials "M. D." had been used, and told them that he was sure that they would not have been influenced by it because they knew that there was no such evidence and that it was an error in the newspaper article. He emphasized that he directed their attention to the matter "* * * so that there will be no doubt of the fact that there is no evidence before you that the defendant ever used the initials M. D.". We think any possible prejudice was eliminated by the instruction of the court.

Appellant's final argument is that the Supreme Bench of Baltimore abused its discretion in denying a new trial on the basis of an affidavit by a spectator at the trial that during a recess in the trial, she observed two members of the jury engaged in a discussion for more than five minutes with the Assistant State's Attorney handling the case. In *Williams v. State,* 204 Md. 55, 64, 66, there was reiterated the familiar rule that "* * * a motion for a new trial is addressed to the discretion of the court in criminal as well as civil cases, and from an order overruling such a motion no appeal will lie." See also *Givner v. State,* 208 Md. 1. If the rule were otherwise, we would see no merit in the contention of the appellant on the facts although, obviously, a prosecutor should not talk privately to a juror during a trial. There is nothing in the affidavit to show or suggest that the conversation between the Assistant State's Attorney and the jurors was in any way connected with the case. The affidavit was produced some five months after the incident and we are informed that at the hearing of the motion for the new trial, no effort was made to elicit from the Assistant State's Attorney in question the subject matter of the conversation nor the details of what occurred.

*Judgment affirmed, with costs.*